## The New York Trust Company et al., Executors (Estate of George Doubleday) v. Mary M. Doubleday et al.

Inglis, C. J., Baldwin, O'Sullivan, Wynne and Daly, Js.

Argued October 10—decided December 11, 1956

*Hugh M. Alcorn, Jr.,* with whom were *Henry P. Bakewell* and, on the brief, *Donald R. Williams, Jr.,* for the named defendant.

*John D. Walker,* with whom was *John J. Kennedy,* for the defendant G. Chester Doubleday.

*Ralph A. Nichols* appeared for the plaintiffs.

*J. Walter Madigan* appeared for the defendants Holbrook et al.

*James M. Carlisle* appeared for the defendants Ripley et al.

O'SULLIVAN, J. George Doubleday died on December 6, 1955, at the age of eighty-nine years. He had executed his will and a codicil thereto on August 11, 1953, and December 24, 1954, respectively. These instruments were admitted to probate on December 15, 1955, by the Probate Court for the district of Ridgefield, wherein the testator had been domiciled. The plaintiffs are his duly qualified executors. The defendants, his sole heirs at law and next of kin, are Mary M. Doubleday, his widow; James M. Doubleday, G. Chester Doubleday and Alice D. Holbrook, his children by a prior marriage; and Alice Ripley and Patricia R. Windels, children of a deceased daughter of his. After the death of his first wife more than twenty-five years ago, the testator remarried in 1937. At his death his widow was

seventy-two years old, and she had lived with him at all times during their marriage.

Article ninth of the will contains the residuary clause. By that article the testator directed his executors to divide the residue into five equal parts, one to go to his widow, one to each of his three children, and one to his two granddaughters. He further provided that if his wife predeceased him, her part should be added equally to the other parts; that if a child of his predeceased him, the part of that child should go to any children of that child who survived him, the testator, or, if none survived, the part should be added equally to the other parts; and that if a granddaughter predeceased him, her share of a part was to go to those of her children who survived him or, if none survived, to the other grandchild.

The last paragraph of article twelfth deals with the subject of taxes. A portion of that paragraph reads: "I direct my executors to pay from my residuary estate all estate, inheritance, transfer, succession and other death taxes or other taxes in the general nature thereof which may be payable with respect to any property included in my gross taxable estate . . . ." We shall refer to this as the tax clause.

The value of the testator's estate for death tax purposes approximates $14,000,000. Specific devises and legacies to the widow, if her claim as to them is sustained, are valued at $1,105,000, and to the children and certain persons not parties to this action, at $700,000. The residuary estate before death taxes thus has a value in excess of $12,000,000. On the strength of the tax clause, the parties are agreed that all estate and succession taxes attributable to the specific gifts are payable from the residuary estate. But upon other matters the parties are in

irreconcilable conflict. Because of this, the executors brought this action for a construction of the will and codicil,[1] seeking thereby to resolve doubts, springing from articles ninth and twelfth, as to the application and effect of the Connecticut proration statute and the marital deduction permitted under the Internal Revenue Code of 1954. They also seek to have us resolve other doubts arising out of article fourth of the will, which deals with gifts to the widow of shares of stock of the General Electric Company and the Corn Exchange Bank Trust Company. The parties have stipulated as to the facts recited above and as to others which we shall hereinafter narrate when discussing article fourth, and the matter is now before us as a reservation for the purpose of obtaining answers to the questions set forth in the footnote.[2]

---

[1] The plaintiffs also asked for a declaratory judgment, but this request was unnecessary and has been ignored.

[2] "(a) Does the Will or Codicil thereto of said decedent contain a direction against proration pursuant to Section 1159d of the 1955 Supplement to the General Statutes of Connecticut of the Federal estate tax and the Connecticut estate tax within the residuary estate?

"(b) Shall the Federal estate tax and the Connecticut estate tax be allocated within the residuary estate in such manner that there should be gross equality, before the payment of such taxes, of the five parts into which the residuary estate is divided or net equality of such parts after the payment of such taxes?

"(c) In the allocation of the Federal estate tax within the residuary estate, is the legacy of one-fifth of the residuary estate of said decedent given, devised and bequeathed to his widow, Mary May Doubleday, under Article Ninth of said Will exclusively entitled to the benefit of the marital deduction?

"(d) If the answer to question (c) above should be in the negative, then in the allocation of the Federal estate tax within the residuary estate, are each of the one-fifth shares of the residuary estate entitled equally to the benefit of said marital deduction?

"(e) If the answers to questions (c) and (d) should both be in the negative, to what extent and to which of the shares of the residuary estate under Article Ninth of said Will shall the benefit of said marital deduction be allocated and credited in the ultimate distribution to be

The first disagreement which we propose to analyze comes from the contention, advanced by the widow, that the ultimate burden of the federal and the state estate taxes on the residuary estate does not fall on her but must be placed on the other residuary legatees, the testator's children and grandchildren. Questions (a) to (e) inclusive are addressed to this phase of the case. To meet her contention, we must first ascertain whether the language of article twelfth, quoted above, is so expressed as to prevent the application of the proration statute within the residuary estate itself. This requires a consideration of the nature and effect of that statute.

The proration statute was enacted by the General Assembly in 1945. Sup. 1945, § 315h (as amended,

made by the plaintiffs as Executors of the residuary estate as directed in Articles Ninth and Twelfth of said Will?

"(f) Shall any part of the Connecticut estate tax payable in this estate, with respect to the residuary estate, be allocated and apportioned against the share of the residuary estate of decedent's widow, Mary May Doubleday?

"(g) If the answer to question (f) above should be in the affirmative, in what manner and to what extent shall the Connecticut estate tax, with respect to the residuary estate, be allocated and apportioned within the residuary estate to the residuary share of said Mary May Doubleday and to the other four shares of the residuary estate under Article Ninth of said Will?

"(h) Is Mary May Doubleday, widow of said decedent, entitled under Article Fourth (B) of said Will to One Thousand (1,000) shares of the common stock of General Electric Company or is said Mary May Doubleday entitled to Three Thousand (3,000) shares of the common stock of General Electric Company as a result of the change in the stock of that company which occurred after the date of execution of the Will of said decedent?

"(i) To which of the following numbers of shares of the capital stock of Chemical Corn Exchange Bank, into which Corn Exchange Bank Trust Company was merged on October 18, 1954, is Mary May Doubleday, widow of said decedent, entitled under Article Fourth (B) of said Will: One Thousand (1,000) shares, One Thousand One Hundred (1,100) shares, Two Thousand (2,000) shares or Two Thousand Two Hundred (2,200) shares?"

Cum. Sup. 1955, § 1159d). Prior to that time, the burden of federal and state estate taxes rested on the estate as a whole and, in the absence of a directive in the will to the contrary—a situation which through ignorance, thoughtlessness or carelessness often prevailed—the taxes were paid out of the residuary estate. *Ericson* v. *Childs,* 124 Conn. 66, 81, 198 A. 176. This created many instances of hardship upon and injustice to widows and children, who, as the natural objects of a testator's bounty, were customarily the residuary legatees and, as such, were frequently saddled with the entire tax, while other beneficiaries, more distantly related to the testator or not related at all, paid no taxes at all. The proration statute was contrived to circumvent these instances of hardship and injustice. It is not a taxing statute. *Parlato* v. *McCarthy,* 136 Conn. 126, 132, 69 A.2d 648. It assumes that a tax either has been or will be paid in conformity with the tax law and then undertakes to determine upon whom the ultimate burden of the tax shall be placed. In short, it takes over where the tax statute leaves off. It provides, in part, that estate taxes, whether federal or state, shall, in the absence of a directive in the will to the contrary, be equitably prorated among the beneficiaries in proportion to the values of their gifts, except that "in making such proration allowances shall be made for any exemptions granted by the act imposing the tax and for any deductions allowed by such act for the purpose of arriving at the value of the net estate." Cum. Sup. 1955, § 1159d. Thus, a testator's silence on the subject of taxes now effects a result different from that which formerly prevailed. Prior to the enactment of the proration statute, his failure to speak on taxes imposed the burden of their payment upon the residuary estate, while,

under the statute, such a failure requires the beneficiary of each gift to pay a proportionate share of the taxes.

We have said that a testamentary directive against the prorating of taxes must be clear and unambiguous, since the practical effect of such a directive is to increase the size of the gifts to some by shifting to others the burden of absorbing the tax. *Jerome* v. *Jerome,* 139 Conn. 285, 289, 93 A.2d 139. Proration, then, is the rule, indeed, the mandate, to which exception is possible only if the testator clearly indicates otherwise. *McLaughlin* v. *Green,* 136 Conn. 138, 142, 69 A.2d 289. Since this is the law, testamentary silence on the subject of taxes might be viewed as the mark of sophisticated draftsmanship, whenever the testator intends proration to govern. But where, as here, a will incorporates an expression as to the payment of taxes, the dictates of prudence require great caution in phrasing the language necessary for disclosing just what lies in the testator's mind, so that all doubt as to the extent or limitation of his command may be completely dispelled.

It is true that the tax clause directs the executors to pay from the residuary estate "all estate, inheritance, transfer, succession and other death taxes or other taxes in the general nature thereof which may be payable with respect to any property included in my gross taxable estate, whether or not such property shall pass under this Will." At first blush, this language might seem to be sufficiently broad and inclusive to cover gifts of the residue itself as well as those resulting from specific devises and legacies. Upon reflection, however, there arises some doubt that this was the testator's intention. Since a doubt exists, the tax clause lacks the

clarity necessary to make the proration statute inoperative as to the residuary gifts. Whatever may have been his unexpressed intention, the testator neglected to speak clearly upon the question of proration as it applies to the residuary gifts. The directive in the will that all estate taxes be paid from the residue is not a directive against the prorating of estate taxes among residuary gifts.

Because the testator ordered that the residue be divided into five equal parts, the foregoing construction of the tax clause would be academic were it not for the impact of what is known as the marital deduction. That deduction is a contrivance incorporated in 1948 into the Internal Revenue Code to extend to the estates of decedents domiciled in noncommunity property states the tax advantages previously enjoyed only by the estates of those who were residents of community property states. Int. Rev. Code of 1939, § 812(e), added by 62 Stat. 117 (now Int. Rev. Code of 1954, § 2056). Under the provisions of the federal law in effect at the death of the testator, there is exempt from the federal estate tax so much of the estate of a decedent as is bequeathed or devised or passes to his surviving spouse, not in excess of 50 per cent of the adjusted gross estate as defined in that law. Int. Rev. Code of 1954, § 2056. We point out parenthetically that both the specific gifts to the widow, with a maximum value of $1,105,000, and the gift of the one-fifth part of the residue qualify in computing the testator's net estate for federal estate tax purposes, but that the value of all gifts to her falls far below 50 per cent of the adjusted gross estate of the testator. In other words, the testator did not make gifts to his widow of such magnitude that the exemption afforded by the marital deduction could be utilized in its fullest scope.

The parties take contrary positions as to the manner of utilizing this deduction. The children and grandchildren maintain that the executors should first pay the federal estate taxes from the residue and then divide what is left into five equal parts, thus attaining the net equality which, they insist, the testator intended to prevail among the residuary legatees. If they are correct in this regard, each of them will enjoy the benefit of the marital deduction to the same extent as will the widow. The widow, on the other hand, contends that the residue should first be divided into five parts in order to attain gross equality, and thereafter the burden of the federal estate taxes on the residuary gifts should be imposed on the residuary legatees other than herself, since she, the widow, is exclusively entitled, as a matter of right under the proration statute, to the benefit of the marital deduction.

In designing this contrivance known as the marital deduction, the Congress created an immunity consisting of a limited exemption from federal estate taxation. This immunity is one which can be asserted only by the estate of the deceased, if the provisions of the federal act alone are involved. That act, however, must be dovetailed with the provisions of the proration statute whenever the latter governs the allocation of federal estate taxes, as is the situation in the case at bar.

As has been previously indicated, allowances under the proration statute must be made for any exemptions or deductions granted or permitted by the act imposing the tax. "While the statute does not specifically state to whom such allowances shall be given, the obvious inference is that it refers to those beneficiaries who received any property, interest or benefit, the value of which was used, by way of de-

duction, to reduce the amount of the taxable estate. ... Only through the allocation of the entire amount of the marital allowance to the value of the widow's bequest will the intent as well as the spirit of the proration statute be met, for the statute is based on the equitable principle that the estate taxes should be borne by those whose bequests contribute to the tax burden and, conversely, that all those whose legacies do not in any way create or add to that burden should not be required to bear it." *Jerome* v. *Jerome,* 139 Conn. 285, 292, 93 A.2d 139. We hold that the widow is entitled to the exclusive benefit of the marital deduction.

The second disagreement between the parties is concerned with the allocation of the Connecticut estate tax. That tax is one "imposed upon the transfer of the estate of each person who at the time of death was a resident of this state, the amount of which shall be the amount by which eighty per cent of the estate tax payable to the United States under the provisions of the federal revenue act in force at the date of such decedent's death shall exceed the aggregate amount of all estate, inheritance, legacy, transfer and succession taxes actually paid to the several states and territories of the United States, including this state, in respect to any property owned by such decedent or subject to such taxes as a part of or in connection with his estate." General Statutes § 2065. Although the language of this statute seems to refer to 80 per cent of the entire federal estate tax, the reference is actually to the "basic" federal tax rather than to the total of both the "basic" and the "additional" tax due to the federal government. This follows from the declared purpose of the General Assembly. "It is the intent and purpose of this chapter [dealing with the estate tax] to

obtain for this state the benefit of the credit allowed under the provisions of section 301, subsection (b), of the federal revenue act of 1926, and any modifications thereof later made." General Statutes § 2070. In other words, the purpose of the Connecticut estate tax was to make certain that the total of death taxes imposed by this state is large enough to absorb the full credit available against the federal estate tax, without increasing the tax liability to any estate. 3 Locke & Kohn, Conn. Probate Practice, p. 3. Thus the state estate tax does no more than to divert into the state treasury what would otherwise be taken by the federal government as a part of the federal estate tax.

The Connecticut estate tax statute, as above noted, adopts as the base for computing the tax 80 per cent of the amount of the basic federal estate tax. Inferentially, then, our statute incorporates within itself the provisions of the federal estate tax statute governing the computation of the federal estate tax, including all of the provisions of the latter statute for exemptions and deductions. It necessarily follows that in applying the proration statute in the case at bar the widow, through the utilization of the marital deduction, is, as to the Connecticut estate tax, in a position identical to that which she occupies as to the federal. Since she is not obligated to pay any part of the latter, she is likewise immune from all obligation as to the former.

The final disagreement between the parties arises from the provisions of article fourth (B) of the will, which reads as follows: "I also give and bequeath to my said wife, Mary May Doubleday, if she shall survive me, one thousand (1,000) shares of the common stock of General Electric Company and one thousand (1,000) shares of the capital stock of Corn Ex-

change Bank Trust Company from my individual holdings of said stocks at the time of my death and not from the holdings of said stocks by Ridgefield Corporation."

When the will was executed on August 11, 1953, the testator individually owned 1600 shares of the common stock without par value of General Electric Company and 1223 shares of the capital stock of Corn Exchange Bank Trust Company. Between that date and December 24, 1954, when the testator executed a codicil to his will, the stock of General Electric Company was changed to a par value of $5 per share and each share of the no par stock was changed into three shares of the stock having the par value of $5. The result of this revamping of the capital structure was that on June 11, 1954 (about six months before the codicil was executed), the testator received 4800 shares of the new stock for that which he had previously owned. At the time of his death he still owned these 4800 shares and no more.

On October 14, 1954, the stockholders of Corn Exchange Bank Trust Company approved a merger of that institution into Chemical Bank and Trust Company. The latter became the continuing company under the name of Chemical Corn Exchange Bank. The merger became effective on October 18, 1954, and thereupon each outstanding share of capital stock of Corn Exchange Bank Trust Company of the par value of $20 was automatically converted into two shares of capital stock of Chemical Corn Exchange Bank of the par value of $10. On December 24, 1954, when the testator executed his codicil, he individually owned 2446 shares of the capital stock of Chemical Corn Exchange Bank. It is the widow's contention that she is entitled to 3000 shares

of the common stock of General Electric Company and 2000 shares of the capital stock of Chemical Corn Exchange Bank.

If the testator's will expressed his intention that his widow was to take 1000 shares of each of the named corporations as he owned them at the time of the execution of his will, she would be entitled to the proportionate increases which she now claims. *Griffith* v. *Adams*, 106 Conn. 19, 26, 137 A. 20; *Fidelity Title & Trust Co.* v. *Young*, 101 Conn. 359, 368, 125 A. 871. The language of the will, however, indicates a contrary intent. His bequests of the stocks were to be "from my individual holdings of said stocks at the time of my death." This language is too positive and clear to be warped into what the widow says it means, in view of two other facts present in the case.

In the first place, at about the same time as General Electric Company split its stock and the Chemical Corn Exchange Bank, after merging with Corn Exchange Bank Trust Company, did likewise, the Ingersoll-Rand Company, of which the testator owned, individually or through his wholly owned personal holding company, 62,628 shares of the common stock, also split each share of common stock into three shares. And in the second place, the testator executed a codicil after all of these corporations had completed the structural changes mentioned above. In that codicil, he revoked article third of his will, wherein he gave to his wife 4000 shares of the common stock of Ingersoll-Rand Company, and to seven other persons a varying number of shares; he then bequeathed by the terms of the codicil 12,000 shares of the stock of the Ingersoll-Rand Company to his wife and tripled each of the bequests he had made in the revoked article; and he concluded his codicil by

stating that "In all respects except as hereinabove revoked, altered or amended, I republish and re-affirm all of the provisions of my said Last Will and Testament, dated August 11, 1953." By this re-affirmance of his will, he disclosed the distinction he wished to make between the gifts of the stock of the Ingersoll-Rand Company and that of the other two corporations. His intention was to extend his bounty to a tripling of the stock in the one company and to limit to 1000 shares each his bounty as to the other companies.

During the course of argument, the widow dis-claimed her right to any stock dividend declared, subsequent to the execution of the codicil, by Chem-ical Corn Exchange Bank.

We answer the questions as follows: (a) No. (b) Gross equality. (c) Yes. (f) No. (h) The widow is entitled only to 1000 shares of the common stock of General Electric Company. (i) One thousand shares. No answer is required of questions (d), (e) and (g).

No costs will be taxed in this court in favor of any party.

In this opinion the other judges concurred.