# NEBRASKA DEPARTMENT OF REVENUE *v.* LOEWENSTEIN

No. 93–823.   Argued October 11, 1994—Decided December 12, 1994

THOMAS, J., delivered the opinion for a unanimous Court.

*L. Jay Bartel,* Assistant Attorney General of Nebraska, argued the cause for petitioner. With him on the briefs was *Don Stenberg,* Attorney General.

*Terry R. Wittler* argued the cause for respondent. With him on the brief was *Larry A. Holle.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *Timothy G. Laddish,* Assistant Attorney General, *Joyce E. Hee,* Deputy Attorney General, and *Patrick J. Kusiak,* and by the Attorneys General for their respective jurisdictions as follows: *James H. Evans* of Alabama, *Grant Woods* of Arizona, *Charles M. Oberly III* of Delaware, *Roland W. Burris*

JUSTICE THOMAS delivered the opinion of the Court.

We took this case to decide whether States may tax interest income derived from repurchase agreements involving federal securities. If the income that taxpayers earn by participating in such agreements constitutes interest on federal securities, then the taxation violates 31 U. S. C. § 3124(a), which exempts interest on "obligations of the United States Government" from taxation by States. On the other hand, if that income constitutes interest on loans to a private party, the taxation is not prohibited by the statute. With respect to the repurchase agreements at issue in this case, we conclude that for purposes of § 3124(a), the interest earned by taxpayers is interest on loans to a private party, not interest on federal securities. Accordingly, we hold that § 3124(a) does not prohibit States from taxing such income.

## I

Respondent is a Nebraska resident who owns shares in two mutual funds, the Trust for Short-Term U. S. Government Securities and the Trust for U. S. Treasury Obligations (Trusts). The Trusts earn a portion of their income by participating in "repurchase agreements" that involve debt securities issued by the United States Government and its agen-

of Illinois, *Pamela Carter* of Indiana, *Chris Gorman* of Kentucky, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Jeffrey R. Howard* of New Hampshire, *Deborah T. Poritz* of New Jersey, *Tom Udall* of New Mexico, *G. Oliver Koppell* of New York, *Heidi Heitkamp* of North Dakota, *Susan Brimer Loving* of Oklahoma, *Theodore R. Kulongoski* of Oregon, *Jan Graham* of Utah, *Jeffrey L. Amestoy* of Vermont, *James S. Gilmore III* of Virginia, and *James E. Doyle* of Wisconsin; and for the Council of State Governments et al. by *Richard Ruda* and *Lee Fennell.*

Briefs of *amici curiae* urging affirmance were filed for The Dreyfus Corporation by *Jeffrey S. Sion;* and for the Investment Company Institute by *Albert G. Lauber, Jr., Paul Schott Stevens,* and *Catherine Heron.*

*Thomas C. Baxter, Jr.,* filed a brief for the Federal Reserve Bank of New York as *amicus curiae.*

cies (federal securities). A typical repurchase agreement used by the Trusts, see App. 65–81, establishes a two-part transaction, commonly called a "repo," between a party who holds federal securities and seeks cash (Seller-Borrower) and a party who has available cash and seeks to earn interest on its idle funds (in this case, the Trusts). In part one of the repo, the Seller-Borrower "transfers" specified federal securities to the Trusts on the records of the Federal Reserve System's commercial book-entry system. Simultaneously, the Trusts transfer a specified amount of cash to the Seller-Borrower's bank account.

In part two of the transaction—which occurs at a later date fixed by agreement or, in the absence of any agreement, upon demand of either party—the Trusts "deliver" the federal securities back to the Seller-Borrower on the Federal Reserve's records, and the Seller-Borrower credits the Trusts' bank account in an amount equal to the sum of the original cash transfer plus "interest" at an agreed-upon rate. This interest rate bears no relation to the yield on the underlying federal securities—either when they were issued by the United States Government or when they later came into the hands of the Seller-Borrower—but is based instead on the current market rate paid on investments with maturities equal to the term of the repo, not to the original or current maturities of the underlying securities.[1]

After deducting administrative costs, the Trusts distribute this interest income to respondent in proportion to his ownership of shares in the Trusts. The State of Nebraska generally taxes interest income, but it does not tax "interest or dividends received by the owner of obligations of the United

---

[1] A repurchase agreement is so called because the parties to the agreement identify part one of the transaction as a "sale" of federal securities from the Seller-Borrower to the Trusts and part two a "repurchase" of the securities by the Seller-Borrower from the Trusts. Because the accuracy of these labels is part of the dispute in this case, we use more neutral terms to describe the transaction.

States . . . but exempt from state income taxes under the laws of the United States." Neb. Rev. Stat. § 77–2716(1)(a) (Supp. 1994). For purposes of Nebraska's income tax law, if interest would be exempt from tax in the hands of the Trusts, then respondent's proportionate share of such interest will be exempt. § 77–2716(1)(b).

A decade ago petitioner considered whether the interest income derived from repurchase agreements involving federal securities and then distributed to respondent and similarly situated individuals was subject to Nebraska's income tax. Petitioner concluded that it was. Neb. Rev. Rul. 22–85–1, Brief for Petitioner 4–5, n. 1. In 1988, respondent brought a declaratory judgment action in the District Court of Lancaster County, Nebraska, asking that Revenue Ruling 22–85–1 be declared invalid as contrary to 31 U. S. C. § 3124(a) and the Supremacy Clause of the United States Constitution. The District Court granted the requested relief. On appeal, the Supreme Court of Nebraska affirmed, concluding that "the income received by [respondent] from repo transactions executed by the [T]rusts involving federal securities is exempt from state taxation under § 3124." *Loewenstein* v. *State,* 244 Neb. 82, 90, 504 N. W. 2d 800, 805 (1993).

As the Nebraska Supreme Court itself acknowledged, see *id.,* at 88–90, 504 N. W. 2d, at 804–805, several state courts have reached directly contrary conclusions,[2] and two Federal

---

[2] See *Hammond Lead Products, Inc.* v. *State Tax Commissioners,* 575 N. E. 2d 998 (Ind. 1991); *Department of Revenue* v. *Page,* 541 So. 2d 1270 (Fla. App. 1989); *Capital Preservation Fund, Inc.* v. *Wisconsin Dept. of Revenue,* 145 Wis. 2d 841, 429 N. W. 2d 551 (App. 1988); *Andras* v. *Illinois Dept. of Revenue,* 154 Ill. App. 3d 37, 506 N. E. 2d 439 (1987), cert. denied, 485 U. S. 960 (1988).

As Justice Caporale pointed out in dissent below, see 244 Neb., at 91–92, 504 N. W. 2d, at 806, at least five other state courts also have reached a result contrary to that of the majority. See *Everett* v. *State Dept. of Revenue and Finance,* 470 N. W. 2d 13 (Iowa 1991); *Comptroller of the Treasury, Income Tax Div.* v. *First United Bank & Trust,* 320 Md. 352, 578

Courts of Appeals have ruled that interest income derived from repos involving municipal bonds is not exempt from federal taxation under § 103(a)(1) of the Internal Revenue Code.[3] We granted certiorari to resolve this conflict, 510 U. S. 1176 (1994), and we now reverse.

## II

We begin with the text of 31 U. S. C. § 3124(a). It provides in relevant part:

> "[O]bligations of the United States Government are exempt from taxation by a State or political subdivision of a State. The exemption applies to each form of taxation that would require the obligation, the interest on the obligation, or both, to be considered in computing a tax . . . ."

Under this provision, a state tax may consider neither the federal "obligation" itself nor the "interest on the obligation." The obligation itself is "considered" when its value is "taken into account, or included in the accounting," *Ameri-*

---

A. 2d 192 (1990); *Borg* v. *Department of Revenue of Oregon*, 308 Ore. 34, 774 P. 2d 1099 (1989); *Massman Constr. Co.* v. *Director of Revenue of Missouri*, 765 S. W. 2d 592 (Mo. 1989); *In re Sawyer Estate*, 149 Vt. 541, 546 A. 2d 784 (1987). Accord, *H. J. Heinz Co.* v. *Department of Treasury*, 197 Mich. App. 210, 494 N. W. 2d 850 (1992) (distinguishing *Matz* v. *Department of Treasury*, 155 Mich. App. 778, 401 N. W. 2d 62 (1986) *(per curiam)*).

[3] See *Union Planters Nat. Bank of Memphis* v. *United States*, 426 F. 2d 115 (CA6), cert. denied, 400 U. S. 827 (1970); *American Nat. Bank of Austin* v. *United States*, 421 F. 2d 442 (CA5), cert. denied, 400 U. S. 819 (1970). Accord, *First American Nat. Bank of Nashville* v. *United States*, 467 F. 2d 1098 (CA6 1972) *(per curiam)*. Cf. *Citizens Nat. Bank of Waco* v. *United States*, 213 Ct. Cl. 236, 248–251, 551 F. 2d 832, 839–840 (1977) (agreeing that these decisions were correct, but distinguishing them on the facts of the case).

The Internal Revenue Service also has concluded that a taxpayer in the position of the Trusts who derives interest income by participating in repurchase agreements does not earn interest on the securities involved in those agreements. See Rev. Rul. 74–27, 1974–1 Cum. Bull. 24; Rev. Rul. 77–59, 1977–1 Cum. Bull. 196; Rev. Rul. 79–108, 1979–1 Cum. Bull. 75.

*can Bank & Trust Co.* v. *Dallas County,* 463 U. S. 855, 862 (1983), in computing the taxable value of a taxpayer's assets or net worth for the purpose of a property tax or the like. See, *e. g., First Nat. Bank of Atlanta* v. *Bartow County Bd. of Tax Assessors,* 470 U. S. 583, 585–586 (1985) (property tax on bank shares). By contrast, the interest on the obligation is "considered" when that interest is included in computing the taxpayer's net income or earnings for the purpose of an income tax or the like. See, *e. g., Memphis Bank & Trust Co.* v. *Garner,* 459 U. S. 392, 393–394 (1983) (tax on net earnings of banks).

By participating in repos involving federal securities, the Trusts (and thus respondent) earned interest income, and Nebraska's income tax admittedly considered that interest in computing respondent's taxable income. We must decide whether for purposes of § 3124(a) the interest earned by the Trusts from these repos is interest on "obligations of the United States Government" or interest on loans of cash from the Trusts to the Seller-Borrower. We conclude that it is the latter, and we accordingly hold that Nebraska's taxation of the income derived by respondent from the repos does not violate § 3124(a).

An investor may earn interest income from a federal security in one or both of two ways. First, the investor may receive periodic payments from the United States Government at the interest rate stated on the face of the security. Such payments are traditionally known as "coupon interest." Second, the investor may acquire the security at a discount from the amount for which it will ultimately be redeemed by the Government at maturity. This discount is also considered interest for purposes of taxation.[4] Although "discount

---

[4] For example, Treasury notes and bonds, which have maturities of at least one year, pay coupon interest on a semiannual basis and may be issued at discount, par (face amount), or premium, depending on market conditions. See 31 CFR §§ 356.5(b), (c), 356.30 (1994). Treasury bills, by contrast, have maturities of not more than one year, pay no coupon interest, and are always issued at a discount. See § 356.5(a). "For purposes

interest" accrues during the term of the security, the investor does not receive it in cash until the security is redeemed or transferred to a third party.

Our examination of the typical repurchase agreement used by the Trusts convinces us that they did not earn either kind of interest on federal securities. Certainly, none of the income the Trusts earn by participating in repos can be attributed to redemptions of the securities or payments of coupon interest by the Government: The Trusts must "pay over to [the Seller-Borrower] as soon as received all principal, interest and other sums paid by or on behalf of the issuer in respect of the Securities and collected by the [Trusts]." App. 69.

Nor can we conclude that the Trusts receive discount interest when the federal securities are transferred back to the Seller-Borrower in part two of the repo. Under the typical repurchase agreement, any individual repo transaction may involve a mix of federal securities with varying maturities, and therefore varying yields. During the term of the repo, these securities earn discount interest based on their respective yields (and on whether they pay coupon interest). The Trusts, however, earn interest from the Seller-Borrower at an agreed-upon rate that is not based on any of these yields, or any combination of them. Thus, the interest that the Trusts earn by participating in the repo will bear no relation to the discount interest earned on federal securities during the same period.

We conclude instead that for purposes of § 3124(a), the interest income earned by the Trusts is interest on loans from the Trusts to the Seller-Borrower, and that the federal securities are involved in the repo transactions as collateral for

---

of taxation the amount of discount at which Treasury bills are originally sold by the United States shall be considered to be interest." § 309.4. See generally M. Stigum, The Money Market 36–37 (3d ed. 1990) (hereinafter Stigum).

these loans. Several features of the repos lead to this conclusion. First, at the commencement of a repo, the Trusts pay the Seller-Borrower a fixed sum of money; at the repo's termination, the Seller-Borrower repays that sum with "interest." As explained above, this repo interest bears no relation to either the coupon interest paid or the discount interest accrued on the federal securities during the term of the repo.

Second, if the Seller-Borrower defaults on its obligation to pay its debt, the Trusts may liquidate the federal securities. But like any lender who liquidates collateral, the Trusts may retain the proceeds of liquidation only up to the amount of the debt plus expenses; any excess must be paid to the Seller-Borrower. Moreover, if the proceeds are insufficient to satisfy the debt, the Trusts may recover the deficiency from the Seller-Borrower.

Third, if the market value of the federal securities involved in the repo falls below 102% of the amount the Trusts originally paid to the Seller-Borrower, the latter must immediately deliver cash or additional securities to the Trusts to restore the value of the securities held by the Trusts to 102% of the original payment amount. On the other hand, if the market value of the securities rises above 102% of this amount, the Seller-Borrower may require the Trusts to return some of the securities to the Seller-Borrower. These provisions are consistent with a lender-borrower relationship in which a prudent lender desires to protect the value of its collateral, while a prudent borrower attempts to pledge as little collateral as possible.

Fourth, the Seller-Borrower may, during the term of the repo, "substitute" federal securities of equal market value for the federal securities initially involved in the transaction. A lender, of course, is indifferent to the particular collateral pledged by the borrower, so long as that collateral has sufficient value and liquidity.

The parties have stipulated that the Trusts (or their agents) take "Delivery" of the federal securities at the commencement of a repo. App. 63. But even this fact is consistent with understanding repos as loans of cash from the Trusts to the Seller-Borrower: "Delivery" of the securities perfects the Trusts' security interests in their collateral. Under the most recent version of § 8–321(1) of the Uniform Commercial Code (U. C. C.), "[a] security interest in a security is enforceable and can attach only if it is transferred to the secured party . . . pursuant to a provision of [§] 8–313(1)." 2C U. L. A. 459 (1991). Section 8–313(1)(a) provides that transfer of a security interest in a security occurs when the secured party "acquires possession of a certificated security." [5] *Id.*, at 402. Of course, possession of the federal securities allows the Trusts to effect an expeditious, nonjudicial liquidation of the securities if the Seller-Borrower defaults. Cf. U. C. C. § 9–504(1), 3B U. L. A. 127 (1992). The ability to liquidate immediately is obviously critical in the context of repo transactions, which may have a lifespan of only a single day.

Based on the foregoing analysis, we conclude that the interest income earned by the Trusts from repurchase agreements involving federal securities is not interest on "obligations of the United States Government." For purposes of 31 U. S. C. § 3124(a), the income is instead interest on loans from the Trusts to the Seller-Borrower. Because § 3124(a) exempts only the former type of interest from state taxation,

---

[5] The parties have also stipulated that delivery of the federal securities is effected "through the Federal Reserve book entry system." App. 63. Although securities held in that system exist not in the form of certificates but only as entries in the records of a Federal Reserve bank, see generally Stigum 636–638, regulations issued by the Treasury Department and other federal agencies indulge in the fiction that transferees acquire possession of certificated securities. See, *e. g.*, 31 CFR § 306.118(a) (1994) (transfer of Treasury notes and bonds); § 350.4(a) (transfer of Treasury bills). Of course, these regulations and their relationship to the U. C. C. are not before us here.

Nebraska did not violate that statute when it taxed respondent's interest income.[6]

## III

Respondent offers two objections to this interpretation of § 3124(a). We find neither of them persuasive.

## A

The typical repurchase agreement at issue in this case explicitly identifies the original transfer of the federal securities to the Trusts as a "sale" and the subsequent transfer back to the Seller-Borrower as a "repurchase." Respondent maintains we should honor this characterization because the repos were structured by the Trusts and the Seller-Borrower as sales and repurchases for valid business and regulatory reasons independent of tax considerations. Respondent relies on our statement in *Frank Lyon Co.* v. *United States*, 435 U. S. 561, 583–584 (1978):

> "[W]here . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties."

We do not believe it matters for purposes of § 3124(a) whether the repo is characterized as a sale and subsequent repurchase. A sale-repurchase characterization presumably would make the Trusts the "owners" of the federal securities

---

[6] It follows from our analysis that it is the Seller-Borrower who earns the interest on the federal securities during the pendency of the repo. Nebraska Revenue Ruling 22–85–1 concludes as much: "The interest earned on the United States government obligations remains the income of the [party] who submitted the securities as collateral for the loan." Brief for Petitioner 4–5, n. 1.

during the term of the repo.  But the dispositive question is whether the Trusts earned interest on "obligations of the United States Government," not whether the Trusts "owned" such obligations.  As respondent himself concedes, "[t]he concept of 'ownership' is simply not an issue under 31 U. S. C. § 3124."  Brief for Respondent 10.

Even if it did matter how repos were characterized for purposes of § 3124(a), *Frank Lyon Co.* does not support respondent's position.  Whatever the language relied on by respondent may mean, our decision in that case to honor the taxpayer's characterization of its transaction as a "sale-and-leaseback" rather than a "financing transaction" was founded on an examination of "the substance and economic realities of the transaction."  435 U. S., at 582.  This examination included identification of 27 specific facts.  See *id.*, at 582–583. The substance and economic realities of the Trusts' repo transactions, as manifested in the specific facts discussed above, are that the Trusts do not receive either coupon interest or discount interest from federal securities by participating in repos.  Rather, in economic reality, the Trusts receive interest on cash they have lent to the Seller-Borrower.

Respondent does not specifically dispute this conclusion but argues that repos are characterized as ordinary sales and repurchases for purposes of federal securities, bankruptcy, and banking law as well as commercial and local government law.  We need not examine the accuracy of these assertions, for we are not called upon in this case to interpret any of those bodies of law.  Our decision today is an interpretation only of 31 U. S. C. § 3124(a)—not the Securities Exchange Act of 1934, the Bankruptcy Code, or any other body of law.

B

At oral argument, respondent advanced another argument against the interpretation of § 3124(a) adopted here: Although petitioner's Revenue Ruling nominally acknowledges the right of the Seller-Borrower to claim the exemption granted by § 3124(a), Nebraska's income tax scheme will not

allow the Seller-Borrower to realize the full amount of the federal exemption. This would allegedly frustrate Congress' purpose in granting the exemption. According to respondent, after the Seller-Borrower has subtracted from its taxable income any "interest or dividends received by [it as] the owner of obligations of the United States," pursuant to subsection (a) of Neb. Rev. Stat. § 77–2716(1) (Supp. 1994), it will then be forced to add back "any interest on indebtedness incurred to carry the [federal] obligations," pursuant to subsection (e)(i) of § 77–2716(1). Respondent conjectures that the interest paid by the Seller-Borrower to the Trusts in the course of repos may constitute just such interest. Respondent therefore hypothesizes that if the Seller-Borrower receives, for example, $100 in interest as the holder of federal securities and pays out $90 to the Trusts in the course of repos involving those securities, Nebraska might give the Seller-Borrower an income tax exemption worth only $10 ($100 minus $90), rather than the $100 exemption that Congress arguably intended.

There is a short answer to respondent's multilayered hypothesis: *this case* does not involve the construction or validity of Nebraska's add-back rule as applied in the repo context. The Nebraska Supreme Court did not cite § 77–2716(1)(e)(i) in its opinion, and we did not grant certiorari to consider that provision.

## IV

Finally, respondent argues that Nebraska's taxation of income from repos involving federal securities violates the Supremacy Clause of the Constitution. First, respondent contends that Nebraska discriminates against federal obligations because it does not tax income from repos involving Nebraska's own state and local obligations. Although Nebraska Revenue Ruling 22–85–1 concerns repos involving "federal government obligations" and does not mention their Nebraska counterparts, respondent has pointed to no statute, revenue ruling, or other manifestation of Nebraska pol-

icy treating "state" repos any different from "federal" repos for tax purposes.

Second, respondent cites our decision in *Rockford Life Ins. Co.* v. *Illinois Dept. of Revenue*, 482 U. S. 182, 190 (1987), in which we stated that "the intergovernmental tax immunity doctrine . . . is based on the proposition that the borrowing power is an essential aspect of the Federal Government's authority and, just as the Supremacy Clause bars the States from directly taxing federal property, it also bars the States from taxing federal obligations in a manner which has an adverse effect on the United States' borrowing ability." According to respondent, undisputed expert testimony in the record establishes that the taxation at issue in this case will make it more difficult and expensive for the Federal Government to finance the national debt.

This expert testimony essentially consists of a 1986 affidavit sworn by Peter D. Sternlight, a former official of the Federal Reserve Bank of New York. In our view, Sternlight's affidavit has no relevance to this case. It concluded only that "an impairment of the repo market would make it less attractive for [government securities] dealers to perform [their] very useful . . . function [of underwriting a sizeable portion of Treasury securities], thus adding to Treasury interest costs." App. 42. But the "impairment" that worried Sternlight would result "[i]f repurchase agreements were to lose their present characteristics of flexibility and liquidity," or if repos became "unavailable" to certain kinds of public and private institutional investors. *Id.*, at 42, 43. These possibilities might develop if repos were to be characterized as secured loans for purposes of federal bankruptcy and banking law or of commercial and local government law. Our decision today, however, says nothing about how repos should be characterized for those purposes.[7]

---

[7] See also Brief for Federal Reserve Bank of New York as *Amicus Curiae* 9–10 ("The Sternlight Affidavit was filed by the New York Fed in 1986 as *amicus curiae* in [a case] which had nothing to do with state

Disregarding the inapplicable Sternlight affidavit, we find no evidence in the record that the taxation at issue will impair the market in federal securities or otherwise impair the borrowing ability of the Federal Government. *Rockford Life* confirmed the rule that " 'when effort is made . . . to establish the unconstitutional character of a particular tax by claiming its remote effect will be to impair the borrowing power of the government, courts . . . ought to have something more substantial to act upon than mere conjecture. The injury ought to be obvious and appreciable.' " 482 U. S., at 190, n. 10 (quoting *Plummer* v. *Coler*, 178 U. S. 115, 137–138 (1900)). Respondent has shown us no "obvious and appreciable" injury to the borrowing power of the United States Government as a result of Nebraska's taxation of the repo income earned by the Trusts. Rather, he has given us "mere conjecture." In these circumstances, we cannot justifiably conclude that Nebraska's taxation of income derived from repos involving federal securities violates the Supremacy Clause of the Constitution.

For the foregoing reasons, the judgment of the Supreme Court of Nebraska is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

taxation of repo income. . . . Mr. Sternlight did not opine on the economic effect of state taxation of repo transaction income on [the market for] the underlying government securities"); Hearings on H. R. 2852 and H. R. 3418 before the Subcommittee on Monopolies and Commercial Law of the House Committee on the Judiciary, 98th Cong., 2d Sess., 106–107 (1984) (letter of Peter D. Sternlight) ("[W]hile the Federal Reserve has gone on record as favoring purchase-and-sale characterization of repurchase agreements, *that statement is limited to a bankruptcy context and should not be taken as an endorsement of purchase-and-sale characterization for tax, accounting, or other purposes*" (emphasis added)).