[This opinion has been published in *Ohio Official Reports* at 87 Ohio St.3d 238.]

KEYCORP, SUCCESSOR IN INTEREST TO SOCIETY CORPORATION [AND TRUSTCORP, INC.], APPELLANT, *v*. TRACY, TAX COMMISSIONER, APPELLEE.

[Cite as *KeyCorp v. Tracy*, 1999-Ohio-43.]

*Taxation—Franchise tax—Amount of bank holding company's repurchase agreements, Eurodollar deposits, cash deposits, and certificates of deposits it had with its wholly owned banking subsidiary are not the types of indebtedness that are excluded by R.C. 5733.05(A)(5)(c) in determining value of bank holding company's issued and outstanding shares of stock.*

(No. 98-1608—Submitted September 15, 1999—Decided December 1, 1999.)

APPEAL from the Board of Tax Appeals, No. 96-M-954.

_____

{¶ 1} KeyCorp, appellant, is a bank holding company owning both banking and nonbanking subsidiaries. KeyCorp was created in 1994 when Trustcorp, Inc. and Society Corporation ("Society") merged. Society, the surviving corporation, changed its name to KeyCorp after the merger. Society's wholly owned banking subsidiary was Society National Bank ("SNB").

{¶ 2} Prior to the merger, for tax years 1990, 1991, and 1992, Society[1] calculated and paid its franchise tax using net worth as the tax base. Finding error in its calculations, the Tax Commissioner issued assessments against Society as follows: $1,194,791.62 for 1990, $198,664.73 for 1991, and $826,533 for 1992. Society filed timely petitions for reassessment. After a hearing, the commissioner reduced the assessments (tax and interest) to $752,256.13 for 1990, $141,566.04 for 1991, and $680,084.74 for 1992.

_____

1. We refer to appellant as "Society," since the assessments were prior to the KeyCorp merger and the franchise tax returns in dispute were filed by Society.

**{¶ 3}** Society appealed the commissioner's decision to the Board of Tax Appeals ("BTA") on two issues:  (1) whether Society was a quiescent holding company and (2) whether the amounts of the repurchase agreements, Eurodollar deposits, cash deposits, and certificates of deposit that it had with SNB on the last day of its fiscal year were excluded by R.C. 5733.05(A)(5)(c) in determining the value of Society's issued and outstanding stock.

**{¶ 4}** The first issue was resolved in Society's favor and the Tax Commissioner has not appealed that finding.  As to the second issue, the BTA ruled against Society, finding that these transactions were not the types of indebtedness that were excluded by R.C. 5733.05(A)(5)(c) in determining the value of Society's issued and outstanding shares of stock.

**{¶ 5}** The matter is now before us upon an appeal as of right.

————————————

*Baker & Hostetler L.L.P., Edward J. Bernert, George H. Boerger* and *Christopher J. Swift,* for appellant.

*Betty D. Montgomery,* Attorney General of Ohio, and *Richard C. Farrin,* Assistant Attorney General, for appellee.

*Vorys, Sater, Seymour & Pease L.L.P., Raymond D. Anderson* and *Scott J. Ziance*; and *Jeffrey D. Quayle*, urging reversal for *amicus curiae*, Ohio Bankers Association.

————————————

**FRANCIS E. SWEENEY, SR., J.**

**{¶ 6}** At issue is whether Society's placement of its excess cash in repurchase agreements, Eurodollar deposits, and cash deposits[2] with SNB creates the types of investments in indebtedness that are excluded by R.C.

---

2.  In its notice of appeal to the BTA, Society included certificates of deposit as another type of disputed transaction.  However, Society has apparently abandoned this claim, since there is no mention of certificates of deposit in the notice of appeal filed with this court or in the submitted briefs.

2

5733.05(A)(5)(c) from the value of the issued and outstanding shares of Society's stock at issue. We answer this issue in the negative, finding that the transactions in question do not constitute investments in the issued indebtedness of SNB and, therefore, should not be excluded under R.C. 5733.05(A)(5)(c). We affirm the BTA's decision.

{¶ 7} Franchise tax is an excise tax paid by domestic and foreign for profit corporations for the privilege of doing business within the state. R.C. 5733.01(A); *Gulf Oil Corp. v. Lindley* (1980), 61 Ohio St.2d 23, 25, 15 O.O.3d 42, 43, 398 N.E.2d 790, 791. R.C. 5733.05 is the statute that provides two bases for the calculation of corporate franchise tax. One measure is based upon the net worth of the corporation and the other measure is based upon the net income of the corporation. Tax is due upon the greater sum of the two methods of calculation. R.C. 5733.06. For the tax years involved, Society paid its tax using its net worth as the tax base.

{¶ 8} The net worth basis calculation begins with the value of the issued and outstanding shares of stock of a corporation, which is described in former R.C. 5733.05(A), as in effect during the period in question, as "[t]he total value, as shown by the books of the company, of its capital, surplus, whether earned or unearned, undivided profits, and reserves, but exclusive of: * * *." Seven specific exclusions are then set forth in R.C. 5733.05(A)(1) through (7). Society relies on the exclusion found in R.C. 5733.05(A)(5)(c):

"(5) A portion of the value of the issued and outstanding shares of stock of such corporation equal to the amount obtained by multiplying such value by the quotient obtained by:

" * * *

"(c) Dividing (1) the amount of the corporation's assets, as shown on its books, represented by *investments in the capital stock and indebtedness of financial institutions* of which at least twenty-five percent of the financial institution's issued

and outstanding common stock is owned by the corporation by (2) the total assets of such corporation as shown on its books." (Emphasis added.) 141 Ohio Laws, Part II, 4166.

{¶ 9} Thus, these provisions allow corporations owning at least a twenty-five-percent interest in financial institutions to exclude the value of those interests.

{¶ 10} Society owned the requisite amount of SNB's common stock. This is not disputed. Instead, the question presented by this case involves the interpretation of the phrase "investments in the capital stock and indebtedness" of a qualifying subsidiary.

{¶ 11} During the tax years in question, Society had excess cash (income over operating expenses) at the end of each business day. Society would use this money to purchase investments that provide a greater rate of return than a savings account. The funds were placed in either repurchase agreements or Eurodollars. Society also had general cash deposits with SNB.

{¶ 12} Society argues that the repurchase agreements, Eurodollars, and cash deposits it had with SNB at the end of each fiscal year represent excludable investments by it in the indebtedness of SNB. Society focuses on the word "indebtedness," contending that there is no basis in the express language of R.C. 5733.05(A)(5)(c) to limit the scope of indebtedness.

{¶ 13} However, the Tax Commissioner contends that the word "indebtedness" cannot be read in isolation. Instead, it must be considered along with the word "investments" as part of the phrase that excludes "investments in the capital stock and indebtedness." Thus, the commissioner contends that the entire exclusionary phrase contained in R.C. 5733.05(A)(5)(c) must be considered. Once this is done, the repurchase agreements, Eurodollars, and cash deposits are not investments by Society in the indebtedness of SNB.

{¶ 14} Statutory construction principles direct us to "ascertain and give effect to the intent of the lawmaking body which enacted it." *Slingluff v. Weaver*

4

(1902), 66 Ohio St. 621, 64 N.E. 574, paragraph one of the syllabus. Moreover, "[i]n looking to the face of a statute or Act to determine legislative intent, significance and effect should be accorded to every word, phrase, sentence and part thereof, if possible." *State v. Wilson* (1997), 77 Ohio St.3d 334, 336-337, 673 N.E.2d 1347, 1350. See, also, R.C. 1.42: "Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

{¶ 15} A review of the statutory history of the phrase "investments in the capital stock and indebtedness" shows that it was enacted in the franchise tax statutes in 1969 as part of Am.Sub.S.B. No. 55. 133 Ohio Laws, Part I, 127. At first, the exclusion was applicable only to public utility holding companies.

{¶ 16} Am.Sub.H.B. No. 475 amended the franchise tax law in 1971. This amendment treated insurance and financial holding companies the same as public utility holding companies, thereby allowing them to exclude their "investments in the capital stock and indebtedness" of qualifying subsidiaries. 134 Ohio Laws, Part II, 1559. By choosing to retain the same exclusionary language, the General Assembly indicated that the criterion for determining excludable "investments in the capital stock and indebtedness" for insurance and financial institution holding companies was to remain the same as it had been for public utility holding companies.

{¶ 17} R.C. Chapter 4905 contains the general powers of the Public Utilities Commission relating to the issuance of stocks, bonds, notes, and other evidences of indebtedness by public utility companies. When Am.Sub.S.B. No. 55 was enacted (and as it remains today), R.C. 4905.40(A), (C), (D), (F)(2), (F)(3), and (G) all contained a phrase, similar to that now under consideration, relating to the issuance by public utilities of "stocks, bonds, notes, and [or] other evidences of indebtedness," "stocks, bonds, and other evidences of indebtedness," or "bonds,

notes, or other evidence[s] of indebtedness." Thus, at the time Am.Sub.S.B. No. 55 was enacted, the only investments available to a public utility holding company would have been "stocks, bonds, notes, or other evidences of indebtedness."

{¶ 18} After considering this history, we believe that the types of indebtedness that would have been available to a public utility for investment were not limited to stock, bonds, and notes. Instead, other evidences of indebtedness were permitted. Additionally, all of the types of indebtedness listed represented indebtedness "issued" by the public utility. Finally, we note that while "other evidences of indebtedness" are permitted, they must be of the same character as stock, bonds, and notes. We make these conclusions based upon the rule of *ejusdem generis* — "where in a statute terms are first used which are confined to a particular class of objects having well-known and definite features and characteristics, and then afterwards a term having perhaps a broader signification is conjoined, such latter term is, as indicative of legislative intent, to be considered as embracing only things of a similar character as those comprehended by the preceding limited and confined terms." *State v. Aspell* (1967), 10 Ohio St.2d 1, 39 O.O.2d 1, 225 N.E.2d 226, paragraph two of the syllabus. Applying this principle, we find that the phrase "other evidences of indebtedness" is not open-ended. Instead, it is limited to and would include only indebtedness issued by the public utility that is similar to stocks, bonds, and notes.

{¶ 19} A repurchase agreement is best described as a type of hybrid transaction that is not exactly a security, not exactly a loan, and not exactly a sale. In *Nebraska Dept. of Revenue v. Loewenstein* (1994), 513 U.S. 123, 126, 115 S.Ct. 557, 560, 130 L.Ed.2d 470, 475, the court described the repurchase agreement used by the parties as "a two-part transaction, commonly called a 'repo,' between a party who holds federal securities and seeks cash * * * and a party who has available cash and seeks to earn interest on its idle funds."

**{¶ 20}** In part one of the transaction, SNB sold a set amount of government securities to Society for a set price. In part two of the transaction, SNB agreed to buy the securities back from Society at a certain time, usually the next day. The predetermined price paid by SNB to repurchase the securities was higher than the initial purchase price paid by Society for the securities. This difference is interest and is determined by a mutually agreed-upon rate, based generally on certain market rates. Any interest earned or paid on the securities during the term of the repurchase agreement stayed with the initial seller (SNB).

**{¶ 21}** A witness for Society described the repurchase transaction as a "collateralized borrowing" with "similar features to a secured loan." Yet, while the repurchase transaction may be conceptualized as a secured loan, it is not. When the United States Supreme Court described the repurchase agreement in *Loewenstein,* 513 U.S. at 126, 115 S.Ct. at 560, 130 L.Ed.2d at 475, it was careful not to characterize repurchase agreements for federal income tax law or debtor creditor law. However, the court pointed out features of the repurchase agreement that were consistent with a normal lender-borrower relationship. It also alluded to testimony about possible consequences that might develop if repurchase agreements were to be characterized as secured loans for purposes of federal bankruptcy and banking law or of commercial and local government law. *Id.,* 513 U.S. at 136, 115 S.Ct. at 565, 130 L.Ed.2d at 481-482. The court went on to say, "Our decision today, however, says nothing about how [repurchase agreements] should be characterized for those purposes." *Id.* at 136, 115 S.Ct. at 565, 130 L.Ed.2d at 482.

**{¶ 22}** In Schroeder, Repo Madness: The Characterization of Repurchase Agreements Under the Bankruptcy Code and the UCC (1996), 46 Syracuse L.Rev. 999, 1008, Professor Schroeder points out that the characterization of a repurchase agreement as a security interest would be disastrous to the multi-trillion-dollar repurchase agreement market because the remedies of Article 9 of the U.C.C.,

rather than the contractual remedies of this agreement, would apply. Likewise, characterization of a repurchase agreement is important when considering whether it should be regulated as a security, or its status in a bankruptcy context.

{¶ 23} Turning now to the record, we find that the only documentary evidence concerning Society's repurchase transactions consisted of Exhibits 4 and 5, which are merely confirmation receipts for the transactions. The confirmation receipts contain a clause under the section entitled "Additional Terms and Conditions Governing Repurchase Agreements," which states that "a repurchase agreement is not a deposit of the bank and is not insured by the FDIC."

{¶ 24} We do not find a sample master repurchase agreement in the evidence. A master repurchase agreement would provide definitions, and specify such terms as the rights and remedies of the parties in the event of a default, substitution of collateral, margin requirements, and notice requirements.

{¶ 25} By not being characterized as a deposit, the repurchase money SNB received from Society was not subject to any charge for FDIC insurance, nor was the bank subject to any reserve requirement on the money. While we know the general characteristics of a repurchase agreement, we know nothing about the specifics of the repurchase agreements involved in this case.

{¶ 26} The second type of financial transaction between Society and SNB involved deposits made by Society with SNB's Grand Cayman branch. Again, the only documentary evidence of the Eurodollar transactions consisted of confirmation receipts.

{¶ 27} Eurodollar deposits are dollar deposits in a foreign bank or a foreign branch of an American bank outside the United States. When Eurodollar deposits are payable only outside the United States, they are exempt from bank reserve requirements and FDIC assessments.

{¶ 28} Society's witness testified that whether a repurchase agreement or a Eurodollar deposit was used to employ excess cash was a function of whether SNB

had collateral at the time of the transaction. If SNB had collateral available a repurchase agreement was used; if not, a Eurodollar deposit was used.

{¶ 29} The third type of financial transaction employed by Society was a cash deposit. Society's witness testified that such deposits were "like a checking account you or I would have."

{¶ 30} Society believes that any indebtedness owed to Society by SNB should be excluded. According to Society, any general deposit made by Society with SNB creates an excludable indebtedness, based on the debtor-creditor relationship that a general deposit creates between a bank and its customer.

{¶ 31} In *Speroff v. First-Cent. Trust Co.* (1948), 149 Ohio St. 415, 37 O.O. 98, 79 N.E.2d 119, paragraph one of the syllabus, this court held: "The relationship between a bank and general depositor is that of debtor and creditor." Here, the Eurodollar and cash deposits represent the type of general deposits that would create a debtor-creditor relationship between Society and SNB. In addition, from Society's point of view, to the extent that Society expected to earn interest on these deposits, they represented a type of investment. We reject Society's contention.

{¶ 32} Instead, we determine that the repurchase agreements, Eurodollar deposits, and cash deposits do not represent excludable types of indebtedness issued by a subsidiary corporation. These transactions are banking customer products. For example, a checking account is a banking customer product created for the use of the customer; it is not issued indebtedness of the bank in which an investment is made. Likewise, while the Eurodollar deposits may create a debtor-creditor relationship, they do not represent indebtedness issued by the bank.

{¶ 33} The repurchase agreements present a somewhat different situation. If the repurchase agreement is interpreted as an actual sale and repurchase of securities, then the transaction clearly would not be an investment by Society in the issued indebtedness of its subsidiary, SNB. Even if the repurchase agreement is interpreted as a collaterized loan to SNB, it still does not meet the criterion of being

an investment in an issued indebtedness of the bank. If the repurchase transactions are viewed as collateralized loans, they could be considered to have created a debtor-creditor relationship. However, the contractual terms of the repurchase transactions are unknown because the record does not contain any evidence of the repurchase agreements between the parties.

**{¶ 34}** Moreover, investments in capital stock and other forms of indebtedness, such as bonds and notes, issued by a corporation are sold to investors by the bank, and do not constitute banking customer products. Customer products are for the use and benefit of the customer. Investments in indebtedness are issued for the benefit of the bank.

**{¶ 35}** R.C. 5733.05(A)(5) states, "investments *in* the capital stock and indebtedness." The word "in" appears to have been ignored by the parties. The investments must be "in" the indebtedness. To be an investment in the indebtedness of the subsidiary requires that the subsidiary first have created an indebtedness in which an investment can be made, *e.g.,* stock, bonds, or notes. This concept parallels that set forth in the sections of R.C. Chapter 4905 discussed above, wherein the investments must be ones "issued" by the public utility holding company's subsidiary. Eurodollar deposits and other deposits with a bank do not represent an indebtedness issued by the bank, nor do they represent any type of security issued by the bank. Securities issued in the indebtedness of a bank are sold to investors, who in turn may resell the security; this is not the case with deposits and repurchase agreements. Not all debt creates an investment in the indebtedness of the debtor within the meaning of R.C. 5733.05(A)(5)(c).

**{¶ 36}** Therefore, we find that when Society placed its excess cash with SNB in repurchase agreements, Eurodollars, and cash deposits, it was dealing with SNB as a bank customer, and not as an investor investing in the indebtedness issued by SNB. Thus, since these transactions are not investments in the issued

indebtedness of SNB, they cannot be excluded under R.C. 5733.05(A)(5)(c). We affirm the BTA's decision.

*Decision affirmed.*

MOYER, C.J., DOUGLAS, SUNDERMANN, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

J. HOWARD SUNDERMANN, JR., J., of the First Appellate District, sitting for RESNICK, J.

––––––––––––––––