[Civ. No. 48370. Second Dist., Div. Five. Dec. 9, 1976.]

THEO CHRISTMAN et al., Plaintiffs and Respondents, v. FRANCHISE TAX BOARD, Defendant and Appellant.

---

**COUNSEL**

Evelle J. Younger, Attorney General, Philip C. Griffin and Rodney Lilyquist, Jr., Deputy Attorneys General, for Defendant and Appellant.

Memel, Jacobs, Pierno & Gersh, Dolman, Kaplan, Neither & Hart and Richard F. Davis for Plaintiffs and Respondents.

---

**OPINION**

**STEPHENS, J.**—This is an appeal from a judgment entered upon a written stipulation of facts. Suit was brought by the respondents to recover sums paid under protest to the California Franchise Tax Board after their pursuit of administrative remedies was exhausted. Upon the ruling that respondents were entitled to a tax credit under Revenue and Taxation Code section 18001, appellant brought this appeal.

*Facts*

In 1965, Chris Motors Corporation (Corporation) was formed under the laws of the State of Georgia, where it located its principal place of business. Theo Christman, the only Californian among the Corporation's three shareholders, has at all material times owned 22 percent of the Corporation's stock. From the inception Mr. Christman has been involved in the operation of the Corporation, performing duties in California and in Georgia during temporary journeys there which have averaged three per year in number. Prior to 1968, Mr. Christman was compensated for his services as a vice president of Chris Motors, but a change in the Corporation's tax status terminated the remunerative arrangement.

In 1965, Mr. Christman was required to pledge and deliver to a Georgia bank all his stock in Chris Motors as security for a loan sought by the Corporation. Three years later the bank released the stock to Mr. Christman's attorney in Georgia, who " . . . placed the . . . certificates . . . in a safe deposit box located in . . . Georgia and has kept said stock [at all times relevant to this case] . . . in trust as security for [Mr. Christman's] performance of certain obligations under a ˙written stock purchase agreement." As stated in respondents' brief: "The purpose of the . . . Agreement under which Mr. Christman's stock [is] pledged [is] to provide for the transfer of control of the Corporation to the surviving shareholders upon the death of any shareholder and to thereby provide for the orderly continuation of the Corporation's business."

In 1968, the shareholders unanimously elected corporate taxation under subchapter "S" of the Internal Revenue Code, resulting in the organization being treated for tax purposes effectively as a partnership rather than a corporation. Georgia provides similar state tax treatment of corporations opting for subchapter "S" provisions, provided that all nonresident shareholders agree to taxation of their pro rata distributions by Georgia as personal income. The obvious purpose of this requirement is to prevent otherwise taxable income from escaping Georgia untaxed through the special tax treatment. Upon unanimous shareholder agreement the Corporation and its owners have been taxed by Georgia under its provisions analogous to subchapter "S."

In the 1969 taxable year, Mr. Christman's allocation of the Corporation's income was $65,768, yielding a personal income tax obligation to

Georgia of $2,423.92, which he paid. During 1970, his allocation was $96,463, resulting in a Georgia tax obligation of $4,664.53, also paid. For both years Mr. and Mrs. Christman claimed, and the Franchise Tax Board (board) disallowed, tax credits under California Revenue and Taxation Code section 18001[1] for the Georgia tax on their California personal income tax returns. The Christmans paid the disputed amounts and pursued administrative remedies for a refund, but to no avail. They then brought the instant action to recover the sums paid under protest, and they prevailed upon the cause as submitted upon a written stipulation of facts. The board now brings this appeal.

### Issues

The ultimate issue is whether the Christmans are entitled to tax credits under Revenue and Taxation Code section 18001 for the taxes they paid to Georgia. The board argues that the rule of *mobilia sequuntur personam* establishes a California source for the income, thereby rendering the credit provisions inapplicable. The Christmans reply that *mobilia* is inapposite because Georgia law, which establishes a source in that state, controls. The framing of the opposing positions raises two crucial subsidiary problems. ■ First, it must be ascertained which state's law governs the determination of the source of the income. Then the correct application of that state's law must be established.

### Whose Law Controls?

The board asserts that the doctrine of *mobilia sequuntur personam* establishes a California situs for the source of the income. *Mobilia* has long been the rule followed in California tax cases. (See *Miller* v. *McColgan,* 17 Cal.2d 432, 439 [110 P.2d 419, 134 A.L.R. 1424].) The Christmans primarily rely on an altogether different rationale for locating the source of the income in Georgia, thereby sidestepping the board's *mobilia* argument. They start by observing that Georgia treats the Corporation's income as if it were earned by a Georgia partnership. They then urge that California is bound by Georgia's characterization of the income, a characterization which they assert compels the conclusion that the income was derived in Georgia.

---

[1]During the period in question, section 18001, in pertinent part, read as follows: "Subject to the following conditions, residents shall be allowed a credit against taxes imposed by this part for net income taxes imposed by and paid to another state on income taxable under this part: [¶] (a) The credit shall be allowed only for taxes paid to the other state on income derived from sources within that state which is taxable under its laws irrespective of the residence or domicile of the recipient."

To support the crucial contention that Georgia law controls, the Christmans cite *Burnham* v. *Franchise Tax Board,* 172 Cal.App.2d 438 [341 P.2d 833], *Clemens* v. *Franchise Tax Board,* 172 Cal.App.2d 446 [341 P.2d 838], and *Crocker-Anglo Nat. Bank* v. *Franchise Tax Board,* 179 Cal.App.2d 591 [3 Cal.Rptr. 905]. *Burnham* is the key case of this trilogy, and in it the court considered the tax credit provision of the predecessor to section 18001. There are two prerequisites for the credit, a *net income tax* applied to income *derived outside California,* and in *Burnham* the issue was whether a Canadian tax on dividends paid by Canadian corporations to nonresident shareholders was a net income or a levy upon gross income. In this regard the court explained that "[s]ince the allowability of the credit claimed under [the statutory tax credit provisions] depends upon the character of the tax [enacted] under the law of the foreign state, a careful analysis of the applicable Canadian tax law is a manifest necessity. And, inasmuch as the credit is allowable only for *'net income taxes'* imposed by and paid to the foreign state the primary objective of our analysis will be to answer this determinative question: *whether the Canadian income tax law . . . imposed a 'net income tax'*?" (*Id.,* at pp. 440-441; italics in original.)

The Christmans seize upon this language and the court's ensuing examination of Canadian tax structures to substantiate the proposition that "a California court can and must look to the law of the foreign state to determine the nature of a tax imposed there . . . ." They further interpret *Burnham* by postulating that " . . . the court examined Canadian law . . . to determine the nature of the Canadian tax . . . and the treatment of the income involved and relied entirely on the Canadian characterization of the tax as binding on California's determination of the entitlement to tax credits."

The Christmans significantly overstate *Burnham.* The court clearly did not examine the "treatment of the income involved." More importantly, a careful reading does not support the interpretation that the court "relied entirely on the Canadian characterization of the tax as binding on California." It is somewhat unclear whether the court relied upon Canadian interpretation of its law, or intended merely to demonstrate that Canada viewed its tax as one upon gross income while relying on the fact that California law so defines it. (See also *Clemens* v. *Franchise Tax Board, supra,* 172 Cal.App.2d at p. 449 (similar uncertainty regarding analysis of nature of trust income).) *Burnham's* ambiguity on this point forces us to search for other authority.

In *Miller* v. *McColgan, supra,* 17 Cal.2d 432, a California resident owned stock in a Philippine mining corporation on which he received dividends, and he sold a portion of his holdings, realizing a profit on the transaction. The Philippines taxed both these gains, and the owner claimed a tax credit, under the provisions of section 18001's predecessor, on his California return. The credit was disallowed and the matter went to court, with the taxpayer losing. It was held that the income's source was the stock, which under the *mobilia* rule has a California situs; thus, the income was not derived outside the state and the credit was therefore inapplicable. The taxpayer argued that under Philippine law the money was earned in the Philippines, a contention analogous to the Christmans' position here. In *Miller* the court dispensed with the issue by concluding that Philippine law did not so characterize the income, which gives rise to the same ambiguity found in *Burnham*—was the decision determined by the court's interpretation of foreign law? Apparently not, for the court elaborated on that at page 444: "By virtue of express statutory provision the Philippines do not apply the maxim of *mobilia sequuntur personam* so as to avoid their taxation of nonresidents on dividends received by them from Philippine corporations or on the income from sales of property having a situs in other jurisdictions. That the Philippines may impose such a tax does not mean that under our theories and our act such income is derived from the Philippines. Rather it simply indicates that the Philippines have adopted a theory and philosophy of taxation different from that adopted by California, which has uniformly applied the well-recognized principle of *mobilia sequuntur personam* in determining the situs of intangibles for purposes of taxation."

Further proof of the *Miller* court's reliance on California law is found in *Robinson* v. *McColgan,* 17 Cal.2d 423, 425-426 [110 P.2d 426], decided the same day as *Miller. Robinson* also involved tax credit provisions and the court ruled that its "statutory interpretation [of California tax law]" announced in *Miller* was controlling. *Robinson* confirms that *Miller* is founded, not upon Philippine law, but solely upon the proper construction of California law. Considering that tax credits are strictly matters of legislative grace and are to be construed against the taxpayer (see, e.g., *Great Western Financial Corp.* v. *Franchise Tax Bd.,* 4 Cal.3d 1, 5 [92 Cal.Rptr. 489, 479 P.2d 993]; *Miller* v. *McColgan, supra,* 17 Cal.2d at pp. 441-442), it would be anomalous indeed to find that the California legislature's bestowal of this tax benefit was intended to depend upon some other state's characterization of a California resident's income.

The Christmans attempt to cast this case in a unique light due to Georgia's special tax treatment of the corporate income, which they term a "tax option." There is no rational basis, however, for distinguishing Georgia's characterization of the source of the income from any other state's possible characterization, whatever the basis for the determination. The result of accepting the Christmans' argument, then, is that in every case involving a California resident's income with respect to out-of-state activities, the applicability of California's tax credit laws, and perhaps other tax statutes, will depend solely upon a sister state's determination of the source of the income. California would thereby be stripped of the power it obviously holds to make its own determination. Viewed in this light, the error of the Christmans' position is patent.

Respondents finally argue that denying the tax credit here forces a result contrary to the legislative intent underpinning section 18001, which intent the board admits is the avoidance of double taxation. It is certainly true that the denial results in the income being taxed by two states (though it might be noted in passing that were there no tax option election, "double taxation" of the income would still occur, albeit through the mechanism of corporate income tax). It goes too far, however, to suggest that section 18001 is a panacea for all double taxation, as is clearly shown by the 1957 amendment to the statute which revoked a previously allowed tax credit for amounts paid to foreign nations. Nor would the provision have the specific requirements of a tax on *net* income earned *outside* the state if its basis were an overweening desire to prevent any double taxation. ■ Rather, section 18001 is narrowly drawn, applying only to cases which include the required elements, and the goal of limited protection against double taxation cannot be used to invoke the provision where California law establishes a California situs for the source of the income.

### *Application of the Controlling State Law*

■ The board argues that by well-settled California law when income springs from the ownership of stock the stock itself is deemed the immediate source of that income. (*Miller* v. *McColgan, supra,* 17 Cal.2d at p. 437.) In the instant case, the source of Christman's income is the stock since it is only through its ownership that he has any claim to the money he received, and the remaining inquiry is the "location" of this intangible. To establish a California situs the board relies on the maxim *mobilia sequuntur personam,* long adhered to in California. (E.g., *Pacific*

*Tel. & Tel. Co.* v. *Franchise Tax Bd.,* 7 Cal.3d 544, 547-548 [102 Cal.Rptr. 782, 498 P.2d 1030]; *Safeway Stores, Inc.* v. *Franchise Tax Board,* 3 Cal.3d 745, 749, fn. 3 [91 Cal.Rptr. 616, 478 P.2d 48]; *Miller* v. *McColgan, supra,* 17 Cal.2d at p. 439.) In locating intangibles at the domicile of their owner, *mobilia* operates here to place the stock, the source of the income, in California, Christman's domicile, with the result that the income was derived in this state. Section 18001 is consequently inapplicable since there are no credit provisions relating to foreign taxes paid on income with a California source.

The Christmans respond with the proposition that this case presents facts which call forth the "business situs" exception to the *mobilia* rule. It is well recognized that intangibles may be so employed by a nonresident in conjunction with his business that they acquire their own domicile, separate and distinct from that of the owner. (E.g., *Holly Sugar Corp.* v. *Johnson,* 18 Cal.2d 218, 223-224 [115 P.2d 8].) Through the use of the stock as security for the Corporation's loan and the subsequent placement of the certificates in the hands of a trustee to preserve control over the concern upon the death of any shareholder, the Christmans claim the "business situs" test has been met, with the stock acquiring domicile in Georgia. The pledge of the stock is irrelevant here for it terminated before the tax years in question, so the issue is reduced to whether the stock purchase agreement trust establishes a business situs in Georgia.

The nub of the business situs concept is succinctly revealed in the earlier cases. "[I]ntangible property may acquire a situs for taxation other than at the domicil of the owner if it has become an integral part of some local business. [Citations.] Business situs arises from the act of the owner of the intangibles in employing the wealth represented thereby, as an integral portion of the business activity of the particular place, so that it becomes identified with the economic structure of that place . . . ." (*Holly Sugar Corp.* v. *Johnson, supra,* at pp. 223-224.)

Those acts by the owner which result in a business situs were elaborated in the earlier case of *Mackay* v. *San Francisco,* 128 Cal. 678, 686-687 [61 P. 382]: "[W]here the . . . credits are in the possession and control of a local agent, who holds them for the purpose of transacting a permanent business, and of investing and reinvesting the proceeds from the principal or interest in such manner that the property or credits comes in competition with the capital of the citizens of the state in which

the agent resides, . . . the credits have a *situs* for the purposes of taxation in the place of residence of the local agent." (Italics added.)

The rule then is that the business situs concept embodies the holding of securities by a local agent for the management of the nonresident owner's permanent business at the agent's residence, and their investment and reinvestment such that the property competes with capital indigenous to that residence. (See *Westinghouse Co.* v. *Los Angeles,* 188 Cal. 491, 496 [205 P. 1076].) In the instant case neither Christman's stock nor the earnings therefrom have been invested by the Georgia agent so as to compete with Georgian capital. It appears that the local agent is merely holding the certificates of stock to prevent their sale or hypothecation; he does not vote the stock, nor receive the earnings, nor is he empowered to sell, convey, trade or otherwise manage the assets as part of a "permanent business" in Georgia, except as provided in the stock purchase agreement. The agreement does not establish a permanent business but rather only creates a device to insure that upon the death of any shareholder control of the Corporation will be retained by the surviving shareholders. Thus, the facts do not support the Christmans' contention that the business situs exception applies.

Nevertheless, they cite *Lowry* v. *County of Los Angeles,* 38 Cal.App. 158 [175 P. 702], as controlling authority for their position. In *Lowry,* a resident of Los Angeles died possessed of 2,000 shares of stock in an Illinois corporation. The shares were held by an Illinois trustee who had the power to manage, control and vote the stock, to collect dividends thereon, pay the taxes due and deliver the net proceeds to the deceased, and to sell, transfer or otherwise dispose of the stock upon the deceased's written acquiescence. The assets of the estate were for some time in the hands of the executor for probate, and during this period Los Angeles County levied an ad valorem tax on the stock, which tax the executor challenged by lawsuit. In ruling for the taxpayer, the court first distinguished the stock's situs for probate purposes from that for tax purposes, went on to observe that "[i]t seems very clear to us that the stock in the hands of the trustees is within the jurisdiction of the taxing power of the state of Illinois," *(id.* at p. 164) (significantly, without explaining why this is so), and concluded that if the county also taxed, the result would be double taxation, which the court felt must be avoided unless the law clearly requires it.

The Christmans seek to utilize *Lowry* in two ways. They first assert that the result is based on the business situs exception, with the instant case being sufficiently analogous as to be controlled by the holding. They also argue that the case stands for the notion that the *mobilia* fiction cannot be used in a manner which causes double taxation. The statement in *Lowry* which seems to support this second point is not so broad as to control this case, even assuming that the dicta retains any validity. Further, the *mobilia* doctrine does not directly cause double taxation here as it did in *Lowry* by creating a second situs for the stock which itself was taxed through the ad valorem levy. In the instant case, involving an income tax, *mobilia* only indirectly affects the situs of the *income* being taxed, and the double taxation is actually a result of other policies.

Equally misplaced is the Christmans' reliance on *Lowry* for their other point. The case has been cited and explained in three places, in each instance with a different interpretation. The most authoritative comment distinguishes *Lowry* from other cases applying the business situs exception, suggesting that it merely stands for the proposition that "[c]orporate stock is often given the status of tangible property in the state where the corporation is organized . . . ." (*Westinghouse Co.* v. *Los Angeles, supra,* 188 Cal. at p. 495.) This statement, though true, is not completely satisfactory for it fails to explain on what principle Los Angeles is denied the power to tax. Other interpretations are that *Lowry* defines a rule on the taxation of trust assets (*Comment on Recent Cases* (1919) 7 Cal.L.Rev. 115, 120-121), and that the case indeed is an application of the business situs concept (Nossaman, *The Fourteenth Amendment in Its Relation to State Taxation of Intangibles* (1930) 18 Cal.L.Rev. 345, 366). Assuming, without deciding, that the last interpretation is correct, the present case is distinguishable because the trustee here does not have title to the stock, nor does he receive the income therefrom, nor has he any but an extremely limited power to manage, control or transfer the stock. In short, the stock is not so employed in Georgia as to give rise to the business situs exception.

The reasoning thus far has established that California rules govern the determination of the nature of the income, that those rules designate the stock in Chris Motors as the source of the Christmans' income, that California law utilizes the *mobilia sequuntur personam* doctrine to locate the stock in California, and that the one exception to the doctrine is inapplicable here. The conclusion, then, is that the income was derived

in this state so that the tax credit provisions of section 18001 of the Revenue and Taxation Code cannot be used. This resolves the case except for two additional constitutional issues raised by the respondents.

*The Constitutional Issues*

■ The Christmans assert that section 18001 as here applied results in arbitrary discrimination between taxpayers who earn money in sister states through partnership activities and those who, like the respondents, receive income from so-called tax-option corporations by taxing only the latter, thereby denying equal protection and violating the Fourteenth Amendment and the state Constitution. The short answer to this is that analogous equal protection arguments concerning section 18001 have been dismissed. (*Tetreault* v. *Franchise Tax Bd.*, 255 Cal.App.2d 277, 282-283 [63 Cal.Rptr. 326]; *Crocker-Anglo Nat. Bank* v. *Franchise Tax Board*, 179 Cal.App.2d 591, 594-595 [3 Cal.Rptr. 905].) The state has considerable discretion in establishing a tax structure (*Tetreault, supra,* at pp. 282-283), and the distinction drawn between partnership income and stock dividends is clearly valid. (E.g., *Crocker-Anglo Nat. Bank, supra,* at p. 595.) Notwithstanding the "tax-option" status for federal and sister-state purposes, California is on firm ground in treating the Christmans' income as deriving from the stock. (See 7 Mertens, Law of Federal Income Taxation, § 41B.22.) Consequently, there is no invidious discrimination violative of the equal protection clause or the state Constitution.

■ The Christmans also raise a curious argument founded on the interstate commerce clause. Apparently, the notion is that the stock represents an "interstate capital investment which clearly is in interstate commerce," and California's subjection of the profit on the investment to taxation, in addition to Georgia's levy thereon, represents an undue burden on interstate commerce. Not surprisingly, no authority is marshalled to support the contention that the stock is somehow part of interstate commerce, and it merits but summary consideration followed by necessary rejection. First, it may be noted that the stock itself is not being taxed, so the question is not whether it is in interstate commerce, which it clearly is not, having come to rest at the domicile of the owner at least since 1968. The only other basis for the Christmans' position, then, is that the dividends are part of interstate commerce. A corporation's payment of a dividend to its shareholder is in no way "commerce" without doing violence to the plain meaning of the word.

In summary, it is apparent the bedrock of the respondents' case is that the "tax-option" status which Chris Motors elected somehow changed the nature of that business organization from the corporate form to something akin to a partnership. The subchapter "S" election, however, had only the limited effect of altering the federal tax treatment of the concern, and likewise for the election under Georgia law. California is not bound to observe any fact other than the Christmans' receipt of income from the ownership of stock in a corporation.

The judgment is reversed.

Kaus, P. J., and Hastings, J., concurred.

A petition for a rehearing was denied December 23, 1976, and respondents' petition for a hearing by the Supreme Court was denied February 3, 1977.