[No. S127086. Aug. 17, 2006.]

GENERAL MOTORS CORPORATION et al., Plaintiffs and Appellants, v. FRANCHISE TAX BOARD, Defendant and Appellant.

774

**COUNSEL**

Ajalat, Polley & Ayoob, Charles R. Ajalat and Christopher J. Matarese for Plaintiffs and Appellants.

Morrison & Foerster, Eric J. Coffill and Carley A. Roberts for Toys "R" Us, Inc., and Affiliates and The Limited Stores, Inc., and Affiliates as Amici Curiae on behalf of Plaintiffs and Appellants.

Pillsbury Winthrop, Jeffrey M. Vesely, Kerne H. O. Matsubara, Richard E. Nielsen and Annie H. Huang for Council on State Taxation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Nielsen, Merksamer, Parrinello, Mueller & Naylor, John E. Mueller and Eric J. Miethke for California Business Coalition as Amicus Curiae on behalf of Plaintiffs and Appellants.

Sutherland Asbill & Brennan and Kendall L. Houghton for Tax Executives Institute, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Michael P. Boyle, Michael J. Bernard, Kurt A. Lamp; Preston Gates & Ellis, James P. Kleier, Brian W. Toman, Charles R. Zubryzcki; Baker & McKenzie and J. Pat Powers for Microsoft Corporation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, W. Dean Freeman and Stephen Lew, Deputy Attorneys General, for Defendant and Appellant.

Frank Katz and Shirley Sicilian for Multistate Tax Commission as Amicus Curiae on behalf of Defendant and Appellant.

**OPINION**

**WERDEGAR, J.**—Like many large companies, plaintiff General Motors Corporation has an active treasury department. Its treasury department

supplements the company's other income-generating activities by investing the company's idle cash in short-term marketable securities. These investments present special analytical problems under the Uniform Division of Income for Tax Purposes Act (UDITPA),[1] which California has adopted (Rev. & Tax. Code, § 25120 et seq.)[2] and which it uses to determine what portion of a multistate company's corporate income it may tax. A key part of the UDITPA, the sales factor, helps allocate a company's income to various states in accordance with the amount of gross receipts the company generates in each state. In turn, this raises the question what proceeds qualify as gross receipts.

Unlike Microsoft Corporation, whose treasury department activities we addressed in the companion case *Microsoft Corporation v. Franchise Tax Bd.* (2006) 39 Cal.4th 750 [47 Cal.Rptr.3d 216] (*Microsoft Corporation*), General Motors Corporation's treasury department preferred not simply to hold its investments until maturity during the tax years in question. Rather, it generated the bulk of its proceeds through repurchase agreements, commonly referred to as "repos." (See generally *Bewley v. Franchise Tax Bd.* (1995) 9 Cal.4th 526, 529 [37 Cal.Rptr.2d 298, 886 P.2d 1292].) In this case, we must decide how repos should be treated under the UDITPA: in particular, what portion of the proceeds from a repo should be treated as gross receipts for purposes of allocating a company's income among the various states? The consequences of the answer are significant; here, for example, the answer may effect a nearly twofold change in the amount of state income tax due. We conclude a repo is analogous to a secured loan for UDITPA purposes and thus only the interest received should be treated as gross receipts.

This case also poses a second question. Like the federal government and many states, California subsidizes new research through a partial tax credit for increases in research spending. When research is performed by one member of a corporate family, does the credit go only to that member or may it be spread among the other members of the corporate family? Here, under the terms of the governing statutes, we conclude only the taxpaying corporation that performed the research is entitled to the credit.

THE UDITPA

■ We explained the relevant principles of the UDITPA in detail in *Microsoft Corporation, supra,* 39 Cal.4th at pages 755–757, and summarize them only briefly here. The UDITPA is designed to determine what portion of

---

[1] Uniform Division of Income for Tax Purposes Act, 7A part 1 West's Uniform Laws Annotated (2002) page 141.

[2] All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

a business's income is properly attributable to its activities in a given state and thus what portion of that income the state may tax. Under the UDITPA, a unitary business's[3] income is divided into "business" and "nonbusiness" income, each subject to different attribution rules. (§ 25120, subds. (a), (d).) Here, we are concerned only with business income. Business income is allocated to each state according to a three-factor formula that considers the amount of property, payroll, and sales a company has in each state. (§ 25128.) As in *Microsoft Corporation,* only the sales factor is at issue. That factor measures the portion of income attributable to a given state by dividing in-state "gross receipts" by all worldwide gross receipts. (§§ 25120, subd. (e), 25134.) The size of this fraction can vary greatly depending on what qualifies as gross receipts. Therein lies the heart of the dispute here.

FACTUAL AND PROCEDURAL BACKGROUND

General Motors Corporation and certain affiliated corporations (collectively, General Motors) engage in a unitary business that operates partially within California. General Motors is engaged principally in manufacturing motor vehicles and motor vehicle parts.

General Motors maintains a treasury department in New York. The treasury department manages General Motors' excess cash from its motor vehicle sales. The investment activities of the treasury department often produce a significant portion of General Motors' net income. During the tax years at issue, 1986–1988, General Motors' net corporate income totaled approximately $7 billion, of which the treasury department generated over $550 million.

During the years at issue, the treasury department used its excess cash to invest in various marketable securities. These included United States Treasury bonds, notes, and bills, and bank certificates of deposit, generally on a very short-term basis.[4] Income from these investments derived from (1) direct sales, (2) redemptions, and (3) repos. Direct sales of securities, i.e., sales before maturity other than pursuant to a repurchase agreement, accounted for 4 percent of treasury department proceeds. Redemptions, i.e., redemptions on maturity of the security, accounted for 6 percent of proceeds. The bulk of treasury department proceeds, 90 percent, derived from repos.

---

[3] A unitary business is one that receives income "from or attributable to sources both within and without the state . . . ." (§ 25101.) "A unitary business is generally defined as two or more business entities that are commonly owned and integrated in a way that transfers value among the affiliated entities." (*Citicorp North America, Inc. v. Franchise Tax Bd.* (2000) 83 Cal.App.4th 1403, 1411, fn. 5 [100 Cal.Rptr.2d 509].)

[4] On average, General Motors rolled over its capital from one investment to the next every 3.25 days.

Defendant Franchise Tax Board (the Board) audited General Motors' 1986–1988 income tax returns. In its initial California tax returns, General Motors treated the majority of the treasury department income as nonbusiness income, not subject to taxation in California. On audit, the Board treated all of General Motors' treasury income as business income subject to California apportionment and taxation. In calculating income to be apportioned to California, the Board included as gross receipts only General Motors' net proceeds from the treasury department's securities transactions. General Motors argued that the gross proceeds from these transactions, totaling almost $1 trillion over the three-year period, were all gross receipts. The Board's inclusion of only net proceeds resulted in almost twice as much income being apportioned to California for 1986 through 1988.[5] General Motors paid all taxes involved, filed claims for refund, and filed protests as the result of certain adjustments made during and after the audit. The Board denied relief.

After exhausting its administrative remedies, General Motors filed a refund complaint for 1986–1988 in the superior court. As relevant here, General Motors raised two issues. First, it challenged the Board's exclusion of the treasury department's gross proceeds from the sales factor (the gross receipts issue). Second, it claimed that a $2.8 million research credit earned for research expenses incurred in the 1988 tax year (see § 23609) should be applied to the tax liabilities of all corporations in its unitary business group that had California tax liability (the research credit issue). The Board allowed only Delco, the member of the General Motors unitary business group that originally incurred qualifying expenses, to use the credit. Because the credit exceeded Delco's tax liability, the Board allowed Delco a credit of approximately $1 million for 1988 and required that the remaining credit be rolled over to future years.

The trial court denied General Motors' motion for summary adjudication on both the gross receipts issue and the research credit issue, and granted the Board's cross-motion for summary adjudication on the research credit issue. Thereafter, the parties agreed a trial would be unnecessary and entered a series of stipulations resolving disputed issues. As relevant here, they agreed that approximately $497 million of treasury department income would be treated as apportionable business income, and gross proceeds from direct sales would be treated as gross receipts. Based on its rulings on the motions for summary adjudication and on the parties' stipulation to judgment, the trial

---

[5] Under General Motors' approach, 1.7 percent of its sales and 1.7 percent of its income, approximately $111 million, would be apportioned to California. Under the Board's approach, 5.6 percent of General Motors' sales and 3.0 percent of its income, approximately $206 million, would be apportioned to California.

court entered a judgment finding that General Motors had overpaid its California franchise taxes and awarding General Motors a refund of approximately $7.4 million.

The Court of Appeal affirmed. It ruled that redemptions and repos were in essence secured loans and that only the net proceeds from these transactions were includible in General Motors' sales factor. It further held that only Delco, and not any other member of the unitary reporting group, was entitled to use the research tax credit. We granted review.

## DISCUSSION

### I. Gross Receipts

#### A. Redemptions

Here, as in the companion case *Microsoft Corporation, supra,* 39 Cal.4th 750, General Motors held some marketable securities until maturity. In *Microsoft Corporation,* we held the entire redemption price of a marketable security is includible as gross receipts in the sales factor. That conclusion applies equally to the marketable securities held to maturity by General Motors. Thus, we conclude the Court of Appeal erred to the extent it excluded the full price of these securities from General Motors' gross receipts.

#### B. Repos

##### 1. The Nature of a Repo

"Repurchase agreements, commonly known as 'repos,' sound esoteric and can be quite complicated. They are, however, in essence nothing more than financing arrangements by which one party provides funds to another for a short period of time. There are two parties to a repurchase agreement: one has money to lend, the other needs cash and has securities. The repurchase agreement itself consists of two transactions that are agreed to simultaneously, but are performed at different times: (1) the seller-borrower agrees to transfer securities to the buyer-lender in exchange for cash; and (2) the seller-borrower agrees to repurchase the securities from the buyer-lender at the original price plus 'interest' on a specified future date or upon demand." (*Bewley v. Franchise Tax Bd., supra,* 9 Cal.4th at p. 529.)

The seller-borrower who transfers the securities and agrees to buy them back is said to be engaged in a repo; the buyer-lender who provides the cash and agrees to sell the securities back is said to be engaged in a reverse repo.

*(Resolution Trust Corp. v. Aetna Casualty & Sur. Co.* (7th Cir. 1994) 25 F.3d 570, 572; *Matter of Bevill, Bresler & Schulman Asset Management Corp.* (D.N.J. 1986) 67 B.R. 557, 567; but see Gov. Code, § 53601, subd. (i)(5)(A), (C) [reversing terms].) It appears General Motors principally engaged in reverse repos, but the distinction between the two transactions is unimportant in this case; thus, we will occasionally refer to both repos and reverse repos generically as "repos."

Repos serve at least four critical functions. First, the Federal Reserve uses repos to make short-term adjustments in the money supply and carry out the government's monetary policy. To restrict the money supply, it enters repos, selling securities and withdrawing cash from the economy; conversely, to expand the money supply, it enters reverse repos, buying securities and injecting cash into the economy. (Note, *Lifting the Cloud of Uncertainty over the Repo Market: Characterization of Repos as Separate Purchases and Sales of Securities* (1984) 37 Vand. L.Rev. 401, 403–404.)

Second, repos are used by securities dealers to finance their underwriting of new government debt issues. A liquid, well-functioning repo market allows dealers to sell current securities holdings for cash (as part of the front end of a repo) and use the cash to acquire new government securities, thereby reducing the federal government's financing costs. (*Bevill, Bresler & Schulman v. Spencer Sav. & Loan* (3d Cir. 1989) 878 F.2d 742, 746; *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.* (S.D.N.Y. 1998) 17 F.Supp.2d 275, 299 (*Granite Partners*).)

Third, repos contribute to the domestic housing market. Mortgage-backed securities guaranteed by government agencies such as the Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation (Freddie Mac) become more attractive to investors when they can be repackaged and resold in an active repo market. These agencies can thus raise funds more cheaply, which in turn means residential home buyers can obtain lower rate mortgages. (*Granite Partners, supra,* 17 F.Supp.2d at p. 299; *Matter of Bevill, Bresler & Schulman Asset Management Corp., supra,* 67 B.R. at p. 568.)

Fourth, repos are a valuable investment tool for the public, institutional investors, large corporations, and state and local governments. Because repos can be structured with a maturity date tailored to the needs of the individual investor, they provide a high degree of liquidity and flexibility. (*Securities & Exch. Com'n v. Miller* (S.D.N.Y. 1980) 495 F.Supp. 465, 471.) This liquidity and flexibility, combined with high yields, makes them an attractive financial management tool for entities (such as General Motors here) with large amounts of idle cash seeking secure short-term investments. (See *Granite Partners, supra,* 17 F.Supp.2d at pp. 299, 302; *Securities & Exch. Com'n v.*

*Miller*, at p. 471; Comment, *The Need for a Uniform Classification of Repurchase Agreements: Reconciling Investor Protection with Economic Reality* (1987) 36 Am. U. L.Rev. 669, 670–671.)

### 2. Characterizing Repos as Sales or Secured Loans

As in *Microsoft Corporation, supra,* 39 Cal.4th 750, the issue here is what portion of the money received by the taxpayer in the course of its securities transactions qualifies as "gross receipts." Also as in *Microsoft Corporation,* we begin by considering how the plain language of the UDITPA applies to these transactions.

The plain language offers little immediate assistance. The statute does not define gross receipts. (See § 25120.) While the term "gross receipts" generally refers to the whole amount received, without deduction (*Microsoft Corporation, supra,* 39 Cal.4th at pp. 758–760 & fn. 7), how this concept should apply to a transaction like a repo is not readily apparent.

Agency interpretation similarly does not decide the question. General Motors relies on two agency decisions, *Appeals of Pacific Telephone & Telegraph* (May 4, 1978) [1978–1981 Transfer Binder] Cal.Tax Rptr. (CCH) paragraph 205-858, page 14,907-36, and *Appeal of Merrill, Lynch, Pierce, Fenner & Smith, Inc.* (June 2, 1989) [1986–1990 Transfer Binder] Cal.Tax Rptr. (CCH) paragraph 401-740, page 25,549, as supporting its position. However, these decisions offer no insight here; in neither case was the tax treatment of repos at issue.

The regulations interpreting the UDITPA are likewise unhelpful concerning the proper treatment of repos. General Motors cites out of context to one regulation that defines the term "loan" to exclude repos (see Cal. Code Regs., tit. 18, § 25137-4.2, subd. (b)(7)), but this citation is unavailing for two reasons. First, the definition expressly applies only within the regulation (*id.,* § 25137-4.2, subd. (b)), and the regulation is a special one governing application of the UDITPA to banks and financial institutions; it has no application to General Motors. Second, the regulation goes on to address the treatment of repos under the gross receipts factor and provides that only the interest (net gain) from repo sales is to be included—precisely the treatment the Board advocates, and contrary to General Motors' position. (*Id.,* § 25137-4.2, subd. (c)(2)(A).)

■ Finding no dispositive answer in either the plain language of the statute or agency interpretations of that language, we turn to a closer examination of the economic reality of repo transactions. (See *Frank Lyon Co. v. United States* (1978) 435 U.S. 561, 573 [55 L.Ed.2d 550, 98 S.Ct. 1291] [in deciding transaction's tax treatment, court should look to transaction's

economic reality]; *Microsoft Corporation, supra,* 39 Cal.4th at pp. 760–761 [examining economic reality of redemptions to decide their tax treatment under the UDITPA]; *Bewley v. Franchise Tax Bd., supra,* 9 Cal.4th at pp. 531–532 [examining economic reality of repos to decide their treatment under federal tax law].)

█ We begin with two baseline observations. First, as both parties agree, in a sale of marketable securities the entire sale price constitutes gross receipts, just as it would for the sale of any other commodity. Second, under the ordinary meaning of gross receipts, "the repayment of a loan is never considered a receipt." (*Marshall v. Commissioner* (10th Cir. 1975) 510 F.2d 259, 262; see also 26 C.F.R. §§ 1.41-3(c)(2)(iii) (2006) [gross receipts exclude "repayment of the principal amount of a loan"], 1.263A-3(b)(2)(ii)(D) [same], 1.448-1T(f)(2)(iv)(A) [same].) Thus, in a secured loan transaction, where A loans money to B and B provides A a marketable security as collateral to secure the loan, the loan principal B repays A is not a gross receipt; only the loan interest constitutes such.

Given these baselines, the Board analogizes a repo to a secured loan or, alternatively, to the simple repeated deposit and withdrawal of cash from a bank account. The Court of Appeal did likewise. To support its analogy, the Board points to prior decisions of the United States Supreme Court and this court that expressly characterized a repo as a secured loan.

In *Nebraska Dept. of Revenue v. Loewenstein* (1994) 513 U.S. 123 [130 L.Ed.2d 470, 115 S.Ct. 557], the United States Supreme Court followed *Frank Lyon Co. v. United States, supra,* 435 U.S. 561, and looked to the economic reality of a repo in deciding how it should be treated under federal tax law, concluding that "in economic reality, the [repo Buyer-Lenders] receive interest on cash they have lent to the Seller-Borrower." (*Loewenstein,* at p. 134.) *Loewenstein* thus concluded that in a repo, the income from the transaction was interest from a private commercial loan and was not subject to the tax shield applicable to income received from the government pursuant to the purchase of government securities. (*Id.* at pp. 130–133; see 31 U.S.C. § 3124.) The Supreme Court dismissed as irrelevant the taxpayer's argument that repos were viewed as sales and repurchases of government securities for purposes of securities, bankruptcy, and banking law. (*Loewenstein,* at p. 134.)

Several months later, in *Bewley v. Franchise Tax Bd., supra,* 9 Cal.4th 526, we reached the same conclusion when addressing the identical tax question. Like the United States Supreme Court, we considered the essential economic reality of the repos at issue. We concluded that they established a lender-borrower relationship, that the securities involved served as the functional equivalent of collateral, and thus that the income from the repos was

essentially interest from private commercial loans. (*Id.* at pp. 531–532.) Thus, in that tax context, we characterized repos as secured loans.

In contrast, General Motors characterizes its repo transactions as sales: in a repo, like any other sale of a commodity, title passes, and thus, General Motors argues, its sale of a security in the course of a repo is no different than its sale of an automobile or its sale of any other security. To support this characterization, General Motors points to numerous decisions that have indeed characterized a repo as a purchase and sale of a security.[6]

In truth, neither side's proffered analogies are precisely accurate, and neither side's cases are precisely on point. A repo is a true hybrid; it blends characteristics of both a sale of securities and a secured loan. (*Matter of Bevill, Bresler & Schulman Asset Management Corp., supra*, 67 B.R. at pp. 596–597; *Keycorp v. Tracy* (1999) 87 Ohio St.3d 238 [1999 Ohio 43, 719 N.E.2d 529, 532].) In some circumstances, it is properly characterized as a secured loan; in other circumstances, it is properly characterized as a purchase and sale of a security. Which characterization fits depends heavily on context; those features of a repo salient in its characterization for bankruptcy purposes, or securities law purposes, or UCC purposes, or even federal tax purposes, are not necessarily the features that will be most salient in characterizing it under the UDITPA. (See *In re County of Orange, supra*, 31 F.Supp.2d at p. 779 ["Different statutes have distinct purposes which warrant corresponding levels of examination. Different levels of examination result in different conclusions" about the correct legal characterization of repos].) Thus, we cannot rely on superficial analogies, nor on the United States Supreme Court's or our own prior decisions that have characterized a repo for other purposes, to decide on which side of the sale/loan line a repo falls for purposes of section 25120, subdivision (e). Nor can we simply accept the repo parties' formal characterizations. Though General Motors' master repurchase agreement provides "[T]he parties intend that all Transactions hereunder be sales and purchases and not loans," for tax purposes the economic reality of a transaction, not the form the parties employ, is dispositive. (*Frank Lyon Co. v. United States, supra*, 435 U.S. at p. 573.) Thus, *Granite Partners, supra*, 17 F.Supp.2d at pages 302–304, relied on by

---

[6] See *In re County of Orange* (C.D.Cal. 1998) 31 F.Supp.2d 768, 778 (repos are not secured loans for purposes of debt-limit provisions of California Constitution); *Granite Partners, supra*, 17 F.Supp.2d at page 302 (repos are purchase and sale agreements and thus not subject to Uniform Commercial Code (UCC) article 9 secured loan obligations); *In re Comark* (Bankr. 9th Cir. 1992) 145 B.R. 47, 53–54 (repos are securities transactions, not secured loans, under particular bankruptcy law provisions); *In re Residential Resources Mortg. Investments* (Bankr. D.Ariz. 1989) 98 B.R. 2, 23 (repos involve sale and repurchase of security); 44 Ops.Cal.Atty.Gen. 140, 143 (1964) (State Treasurer is authorized to enter repos because they involve sale, not loan).

General Motors, which found this expression of intent dispositive for UCC purposes, is not instructive.

■ To identify the portion of a repo that constitutes gross receipts, we consider how and why a sale or redemption of a security, on the one hand, and a secured loan, on the other, are treated differently for gross receipts purposes. Gross receipts are "[t]he total amount of money or other consideration received by a business taxpayer for goods sold or services performed in a year, before deductions." (Black's Law Dict. (8th ed. 2004) pp. 722–723, citing 26 U.S.C. § 448; see *Microsoft Corporation, supra*, 39 Cal.4th at p. 759, fn. 7.) In both the sale and redemption of a security, the entire amount is received for the relinquishment of a commodity. In contrast, in a secured loan, some of the amount is received for a service, the use of money (interest), while the remainder is simply a return of the money used (principal). The return of principal does not fit within the definition of gross receipts.

To better understand this basic distinction and how it applies even in the case of debt instruments like bonds and Treasury bills, consider the case of a security (a $10,000 Treasury bill, say) bought on the market from a securities dealer, then redeemed with the issuer, the United States government. The price the purchaser/taxpayer receives on redemption, $10,000, is dependent on the value of the commodity it holds and independent of the price it paid to the broker. The taxpayer is not being repaid for money it lent; it had, in fact, paid nothing and lent nothing to the United States government. The entire amount received is properly treated as gross receipts.

There are in fact four scenarios for acquisition and disposition of this hypothetical Treasury bill: (1) purchase from a third party/redemption with the issuer; (2) purchase from the issuer/redemption with the issuer; (3) purchase from the issuer/sale to a third party; and (4) purchase from a third party/sale to a third party. The dispositions in the first two scenarios are labeled "redemptions" and in the last two are labeled "sales," but in each case the two halves of the transaction are independent, which illustrates a fundamental point: in the dispositional half of the transaction, the transaction we are analyzing for tax purposes, money is received for surrendering title to a marketable security and not for a service (i.e., the use of money—interest), because the amount received is dependent on the value of the security and independent of the amount one originally provided the buyer/issuer.

In contrast, with a secured loan the opposite is true. The amount received is dependent on the amount originally paid (loaned) and is independent of the particular value of the securities held as collateral, whose value may rise or fall during the term of the loan without affecting the amount received. Neither

General Motors nor the Board contends here that the return of money loaned is money received in payment for goods or services and is includible in gross receipts.

Viewed this way, it becomes apparent that, for gross receipts purposes, a repo has the characteristics of a loan, not the sale of a commodity. In a repo, the amount paid depends not on the value of the surrendered security, but on the amount of money the repo buyer paid the repo seller in the front end of the transaction. This can be seen from two key features of a standard repo transaction, each of which is present in General Motors' repos.[7] First, under a provision generally referred to in the securities trade as a "mark-to-market" provision,[8] if the value of the securities drops, the buyer may require the seller to provide additional securities to ensure the value of the securities held exceeds 102 percent of the agreed-upon repurchase price. Conversely, if the value of the securities rises, the seller may require the buyer to return securities sufficient to maintain the value of the amount held at no more than 102 percent. Thus, as with a secured loan, market fluctuations in value create a right to increase or reduce the amount of securities (collateral) held; the buyer is protected from fluctuations in the value of the securities it has acquired. (See *In re County of Orange, supra*, 31 F.Supp.2d at p. 777.) Second, the repurchase price is set exclusively by reference to the purchase price and is independent of any increase or decrease in value the sold securities may undergo.[9] Instead, the repurchase price is the purchase price increased by an annual percentage rate, adjusted for the number of days between sale and repurchase. Thus, the repurchase price is dependent on the money initially paid and independent of the value of the securities surrendered. Consequently, the repurchase price is payment for the interim use of the repo buyer's money, not payment for the securities the repo buyer is "returning." This means, in a repo, the seller is "buying" cash (i.e., receiving a loan), while in a sale or redemption, the buyer/issuer is paying for a commodity. Thus, a repo is properly characterized as a secured loan for gross receipts purposes.

■ To summarize: For tax purposes, we care why money is being received. If it is received in exchange for a commodity, we treat the full price as gross receipts. If it is received in exchange for the use of money, only the

---

[7] General Motors entered repo transactions under a form master agreement, the "Public Securities Association Master Repurchase Agreement." Repo market participants have adopted that agreement as the industry standard. (*Granite Partners, supra*, 17 F.Supp.2d at p. 303.)

[8] See *Resolution Trust Corp. v. Aetna Casualty & Sur. Co., supra*, 25 F.3d at page 574; *Matter of Bevill, Bresler & Schulman Asset Management Corp., supra*, 67 B.R. at page 585.

[9] Indeed, both the purchase and repurchase price may be set without reference to market rates for the securities involved. (See *In re County of Orange, supra*, 31 F.Supp.2d at p. 772, fn. 4 ["The original sale and repurchase price is typically less than the prevailing market value of the securities"]; 44 Ops.Cal.Atty.Gen. 140, *supra*, at p. 142.)

interest, not the principal, is a gross receipt. In a *securities sale* or *redemption*, the price paid the seller is a function of the securities held and is independent of the initial cost. In a *secured loan*, the price paid is tied to the initial cost (the amount loaned) and is independent of fluctuations in the value of the securities held. In a *repo*, the price paid is also tied to the initial cost and is independent of fluctuations in the type or value of the securities held. Thus, a repo has the characteristics of a loan, and only the interest received is a gross receipt for purposes of the UDITPA.

■ The only out-of-state case to consider the question, *H.J. Heinz Co. v. Dept. of Treasury* (1992) 197 Mich.App. 210 [494 N.W.2d 850], reached the same result. There, as here, the court rejected the parties' characterizations of their transactions as purchases and sales and emphasized it "must consider the real nature of the transactions without regard to the terms applied to them by the parties." (*Id.* at p. 853.) The taxpayer was engaged in reverse repos; it purchased securities from various financial institutions with its excess cash and resold them the next day, although "[t]he securities, themselves, never changed hands." (*Id.* at p. 851.) Rather, the taxpayer received its cash back, plus one day's earnings at the quoted yield. (*Ibid.*) On these facts, the court concluded the repo transactions should be treated like secured loans. (*Id.* at p. 853; see also 18-125 Me. Code R. § 801.08, subd. (B)(2) [treating repos as loans for gross receipts purposes]; Va. Dept. of Tax. public doc. ruling 91-212 (Sept. 6, 1991) [same].) As we have previously noted, when interpreting the UDITPA, we will strive to achieve uniformity with sister states when possible. (*Microsoft Corporation*, 39 Cal.4th at pp. 766–767; *Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 526 [106 Cal.Rptr.2d 548, 22 P.3d 324]; see also § 25138 [the UDITPA "shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it"].)

This interpretation does no harm to the aforementioned essential role repos play in the national economy. The key features that make repos valuable for short-term investments, short-term capital acquisition, and control of monetary policy are their liquidity, security, high yields, and efficient default remedies.[10] Treating them as secured loans solely for UDITPA purposes does nothing to impair these essential features.

■ Thus, we hold that only the interest from repo transactions should be included as gross receipts.

---

[10] See *Securities & Exch. Com'n v. Miller*, *supra*, 495 F.Supp. at page 471; Comment, *The Need for a Uniform Classification of Repurchase Agreements: Reconciling Investor Protection with Economic Reality*, *supra*, 36 Am. U. L.Rev. at pages 670–671; Schroeder, *Repo Madness: The Characterization of Repurchase Agreements Under the Bankruptcy Code and the U.C.C.* (1996) 46 Syracuse L.Rev. 999, 1007–1009.

### 3. *Regulatory and Constitutional Objections*

■ General Motors argues that the Board's exclusion of some of its investment proceeds in this case constitutes a regulation subject to the requirements of California's Administrative Procedure Act. (See Gov. Code, § 11340 et seq.) An agency action is subject to that act, however, only if it adopts a rule applicable to a range of cases. (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 333–334 [42 Cal.Rptr.3d 47, 132 P.3d 249]; *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571 [59 Cal.Rptr.2d 186, 927 P.2d 296].) The Board's decision concerning how the tax laws should apply to General Motors' transactions is not such a rule.

■ General Motors further argues that refusal to include the entire proceeds involved in repo transactions is unconstitutional, in violation of the due process and commerce clauses.[11] To establish this, it has the burden of showing " 'by "clear and cogent evidence" that the income attributed to [California] is in fact "out of all appropriate proportions to the business transacted . . . in that State," [citation], or has "led to a grossly distorted result," [citation].' " (*Container Corp. v. Franchise Tax Bd.* (1983) 463 U.S. 159, 170 [77 L.Ed.2d 545, 103 S.Ct. 2933].) It has not done so. General Motors' argument focuses instead on the effect exclusion of gross proceeds would have on the attribution of income to *New York.* As California's tax law is not being used to calculate tax on New York income, and as General Motors has failed to demonstrate any grossly disproportionate attribution of income to California, the argument fails.

### C. *Application of Section 25137*

■ As we discussed in depth in *Microsoft Corporation, supra,* 39 Cal.4th at pages 764–770, the UDITPA contains a relief provision, section 25137, pursuant to which either the taxpayer or the Board may argue (1) the standard formula fails to fairly represent the extent of the taxpayer's California business activity, and (2) the taxpayer's or Board's proposed alternative method of calculation is reasonable. Here, in the parties' stipulation prior to entry of judgment, the Board expressly reserved the right to argue that any gross securities proceeds included in the sales factor produced distortion and should be excluded under section 25137. Neither the trial court nor the Court of Appeal had occasion to address application of this relief provision. Because the full proceeds from General Motors' redemptions should have been treated as gross receipts, we remand for further proceedings to allow the Board to make its section 25137 case in accordance with the principles set out in *Microsoft Corporation.*

---

[11] As we agree that exclusion of the entire price of a redemption is incorrect as a statutory matter, we need not address the further contention that its exclusion contributes to an unconstitutional distortion.

II. *Section 23609: California's Research Tax Credit*

General Motors is a unitary business group consisting of more than 100 corporations. Only 38 members of the group incurred 1988 California tax liability. One, Delco, incurred slightly more than $2.8 million in research expenses that qualified for a research tax credit. (See § 23609.) The Board allowed Delco to apply this credit to its 1988 tax liability and, because the credit exceeded Delco's 1988 liability, to roll over the credit to subsequent years. (§ 23609, subd. (f) [unused portions of credit may be carried forward].) General Motors argues the Board should instead have allowed the credit to be shared among all members of its unitary reporting group that incurred 1988 California tax liability. Like the trial court and Court of Appeal, we conclude the Board is correct and only Delco is entitled to use the tax credit.

Tax credits are a matter of legislative grace. (*Christman v. Franchise Tax Bd.* (1976) 64 Cal.App.3d 751, 757 [134 Cal.Rptr. 725].) The Legislature may grant or deny a tax credit in any manner it sees fit, aside from constitutional constraints not at issue here, and the scope, application, and terms of eligibility are entirely for the Legislature to establish. Our role is confined to ascertaining what the Legislature has actually done, not assaying whether sound policy might support a different rule. We construe section 23609, the provision allowing the research tax credit, strictly against General Motors, resolving any doubts in favor of the Board. (*Miller v. McColgan* (1941) 17 Cal.2d 432, 442 [110 P.2d 419]; *William Lyon Co. v. Franchise Tax Bd.* (1992) 4 Cal.App.4th 267, 275 [5 Cal.Rptr.2d 680].)

Section 23609 grants "a credit against the 'tax' (as defined by Section 23036) [in] an amount determined in accordance with Section 41 of the Internal Revenue Code" for research expenses. In turn, section 41 of the Internal Revenue Code (26 U.S.C. (hereafter IRC)) defines the kind of research, kind of expenses, and method of calculation to be used in determining a research credit. (IRC § 41(b)–(e).) In general terms, the research credit is measured as a percentage (20 percent under federal law, a varying percentage under state law) of the increase in research expenses in a given year over a taxpayer's established base level of research spending. (IRC § 41(a); Rev. & Tax. Code, § 23609, subds. (a)–(b).) Thus, companies that increase their research spending get a partial subsidy.

Like any other expense, a unitary business group's qualified research expenses are initially incurred by a specific member or members of the group—here, Delco. These expenses are then apportioned among all members

of the group in accordance with unitary business principles.[12] In essence, the Board argues that the research tax credit should be distributed in accordance with each member's *actual* research expenses—based on who actually incurred the expense—while General Motors argues the tax credit should be distributed in accordance with each corporation's *apportioned* share of the research expenses.

On its face, nothing in section 23609 defines whether the credit should be distributed according to actual or apportioned research expenses. However, IRC section 41, incorporated by reference, provides insight into the question. Subdivision (f)(1)(A) addresses the application of the credit to a controlled group of corporations: "(A) Controlled group of corporations.—In determining the amount of the credit under this section—[¶] (i) all members of the same controlled group of corporations shall be treated as a single taxpayer, and (ii) the credit (if any) allowable by this section shall be its proportionate shares of the qualified research expenses and basic research payments giving rise to the credit." Because apportionment principles are irrelevant in the federal tax scheme, IRC section 41(f)(1)(A)(ii) necessarily means any research credit should be distributed pro rata in accordance with the proportionate share of *actual* expenses and payments; thus, those corporations that did not increase research expenses and payments should get no part of the credit. The regulations interpreting IRC section 41 for the relevant tax years[13] confirm this reading: "No amount of credit is allocated to [those members of the controlled group of corporations whose] research expenses did not increase in the taxable year." (26 C.F.R. former § 1.41-6(a)(4) (2004) [example 1] [applicable to pre-1990 tax years].)

The Legislature could have noted its decision to depart from this rule when it passed section 23609; the text of the section consists almost entirely of a list of dozens of ways in which it elected to modify IRC section 41 for state purposes. (See § 23069, subds. (a)–(j).) Yet nowhere in the statute does the Legislature indicate it wished to apply a different rule and issue credits based on apportioned, rather than actual, contributions to research. In the absence of a contrary statement, we must interpret section 23609 consistently with IRC section 41.

---

[12] California first determines what portion of a unitary business's net business income should be apportioned to California, a process known as interstate apportionment. The income apportioned to California, which includes gross income less expenses, is then allocated to each of the individual companies doing business in California, a process known as intrastate apportionment. (*In the Matter of the Appeal of Huffy Corp.* (Apr. 22, 1999) [1995–1999 Transfer Binder] Cal.Tax Rptr. ¶ 403-031, pp. 29,257, 29,259 & fn. 4.) In this fashion, gross income and expenses are apportioned among all the members of the unitary group.

[13] Federal regulations interpreting the IRC are treated as authoritative state regulations to the extent they do not conflict with either the express provisions of the Revenue and Taxation Code or regulations issued by the Board. (§ 23051.5, subd. (d).)

■ We note as well that when the Legislature wishes to allow corporations that have not incurred expenses to share in a tax credit, it knows how to say so. In 1976, the Legislature adopted a solar energy tax credit and allowed unitary group corporations that did not own the premises where the solar energy system was installed to share in the credit. (Former § 23601, subd. (d), added by Stats. 1976, ch. 168, § 3, pp. 279–280, and repealed by Stats. 1986, ch. 1200, § 2, p. 4259; *In the Matter of the Appeal of AeroVironment, Inc.* (Jan. 10, 1997) [1995–1999 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 402-906, pp. 28,765, 28,766.) Two years later, the Legislature apparently changed its mind and amended this provision, limiting the credit to owners. (Stats. 1978, ch. 1159, § 2, p. 3561.) More recently, the Legislature passed a low-income housing credit and again included an express provision authorizing corporations to share the credit with their affiliates. (§ 23610.5, subd. (q)(1) ["A corporation may elect to assign any portion of any credit allowed under this section to one or more affiliated corporations for each taxable year in which the credit is allowed"].) No similar language appears in section 23609. Finally, in 1992 (after the tax years at issue here), the Legislature enacted a statute making the default rule explicit: "Unless otherwise provided, if two or more taxpayers share in costs that would be eligible for a tax credit allowed under this part, each taxpayer is eligible to receive the tax credit in proportion to its respective share of the costs paid or incurred." (§ 23036, subd. (g).) This parallels the rule already embodied in IRC section 41: the tax credit goes to those who actually incur research costs. In the absence of any language in section 23609 indicating the Legislature had a different rule in mind, we conclude the research tax credit goes to the corporation that actually incurred research costs—here, Delco.[14]

General Motors' argument that the research credit should flow along with each affiliate's share of apportioned research expenses also contains a core illogic. Were the argument correct, the credit would flow with these apportioned expenses to every one of the 100 or more corporate affiliates, because (like any other expense) Delco's research expenses are apportioned to every member of the unitary group, not just those in California. But because not all of the corporations in the General Motors unitary group are subject to taxation in California, a substantial portion of the tax credit would go to corporations with no California tax liability. We doubt the Legislature intended such an absurd result. While General Motors agrees and suggests, somewhat contradictorily, that the credit should be reapportioned among only those members with California tax liability, this would require a hybrid

---

[14] General Motors and numerous amici curiae express concern that this interpretation of section 23609 is poor policy and will harm California's ability to attract companies doing cutting-edge research. Whether or not this is so, it is not a matter we are at liberty to consider. Such pleas are properly directed to the Legislature, which is free to amend the terms of the research tax credit in any constitutional manner it deems appropriate.

"neither fish nor fowl" calculation in which the credit is issued neither in accordance with actual expenses nor in accordance with apportioned expenses, but in accordance with those apportioned expenses attributed only to a subset of the unitary group, renormalized to 100 percent. Section 23609's language cannot support such a construction. (Cf. McIntyre, Mines & Pomp, *Designing a Combined Reporting Regime for a State Corporate Income Tax: A Case Study of Louisiana* (2001) 61 La. L.Rev. 699, 742–744 [General Motors' hybrid approach to tax credit apportionment reflects a "major departure from [unitary business] principle[s]," and a legislative intent to adopt such a scheme should be inferred only in the presence of clear evidence of such an intent].)

## DISPOSITION

For the foregoing reasons, we affirm in part and reverse in part the judgment of the Court of Appeal and remand the case for further proceedings consistent with the discussion herein and in *Microsoft Corporation, supra,* 39 Cal.4th 750.

George, C. J., Kennard, J., Baxter, J., Moreno, J., Huffman J.,[*] and Hull, J.,[†] concurred.

The petition of appellant Franchise Tax Board for a rehearing was denied October 25, 2006. Chin, J., and Corrigan, J., did not participate therein.

---

[*]Associate Justice, Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[†]Associate Justice, Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Consitution.