Filed 7/13/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| KATHLEEN GRACE et al., | |
| Plaintiffs and Appellants, | G061004 |
| v. | (Super. Ct. No. 30-2019-01116850) |
| THE WALT DISNEY COMPANY et al., | O P I N I O N |
| Defendants and Respondents. | |


Appeal from an order of the Superior Court of Orange County, William D. Claster, Judge. Reversed.

McCracken, Stemerman & Holsberry, Richard G. McGracken, Sarah Grossman-Swenson, Ivy Yan; Hadsell Stormer & Renick & Dai, Randy Renick and Cornelia Dai for Plaintiffs and Appellants.

Wilmer Cutler Pickering Hale and Dorr, Alan Schoenfeld, Ryan Chabot and David C. Marcus for Defendant and Respondent the Walt Disney Company.

Constangy, Brooks, Smith & Prophete and Carolyn E. Sieve for Defendants and Respondents Sodexo, Inc., and SodexoMagic.


\*          \*          \*

In 2018, Anaheim voters approved a Living Wage Ordinance (LWO). (Anaheim Mun. Code, § 6.99 et seq.)[1] The LWO applies to hospitality employers in the Anaheim or Disneyland Resort areas that benefit from a "City Subsidy." (§ 6.99.060.)

In 2019, Kathleen Grace and other plaintiffs ("the Employees") filed a class action complaint against the Walt Disney Company, Walt Disney Parks and Resorts, U.S., Inc. ("Disney") and Sodexo, Inc., and Sodexomagic, LLC ("Sodexo") alleging a violation of the LWO. Sodexo operates restaurants in Disney's theme parks. Disney filed a motion for summary judgment and Sodexo joined (its liability is derivative).

It is undisputed the Employees were not being paid the required minimum hourly wage under the LWO. However, Disney argued it was not covered under the LWO as a matter of law because it is not benefitting from a "City Subsidy." (See § 6.99.060.) The trial court granted the motion for summary judgment. We disagree.

"A 'City Subsidy' is *any agreement* with the city pursuant to which a person other than the city has *a right to receive a rebate* of transient occupancy tax, sales tax, entertainment tax, property tax or other taxes, presently or in the future, matured or unmatured." (§ 6.99.030, italics added.)

Generally, a "rebate" means "a return of a part of a payment." (Webster's 11th New Collegiate Dict. (2003) p. 1037.) A transient occupancy tax is paid by a transient (a hotel guest) and collected by an operator (the hotel). (See § 2.12.120.) A sales tax is paid by a consumer and collected by the retailer. (See § 2.04.040.) And a property tax is paid by a property owner and collected by the county government. (See § 2.08.) The City of Anaheim ("the City") imposes no entertainment tax.

In 1996, Disney and the City signed an Infrastructure and Parking Finance Agreement (the "Finance Agreement"). The City agreed to issue about $400 million in municipal bonds. The money was to be used to revitalize the Anaheim and Disneyland

---

[1] Further undesignated statutory references are to the Anaheim Municipal Code (italics within code omitted throughout).

resort districts, to pay for infrastructure improvements, and to expand the Anaheim Convention Center. The bondholders were to be repaid based on anticipated incremental increases in the City's transient occupancy taxes (paid by hotel guests), sales taxes (paid by consumers), and property taxes (paid by Disney).

The parties also signed a Disney Credit Enhancement Agreement (the "Enhancement Agreement") and a Reimbursement Agreement. Under the Enhancement Agreement, Disney agreed that if there was any year in which the City's incremental tax revenues failed to meet its bond obligations, Disney would make up the shortfall. And under the Reimbursement Agreement, the parties agreed Disney would be reimbursed for its shortfall payments in those years when the City's incremental tax revenues rebounded and were sufficient to meet its bond obligations.

We find the Reimbursement Agreement gives Disney the right to receive a rebate—or a return—of transient occupancy taxes (paid by hotel guests), sales taxes (paid by consumers), and property taxes (paid by Disney), in any rebound years when the City's tax revenues are sufficient to meet its bond obligations. Consequently, Disney receives a "City Subsidy" within the meaning of the LWO and it is therefore obligated to pay its employees the designated minimum wages. Thus, we reverse the trial court's order granting Disney and Sodexo's motion for summary judgment.

I

FACTS AND PROCEDURAL BACKGROUND

In 1996 and 1997, the Anaheim Public Financing Authority (the Authority), the City, Disney, and a bond trustee signed several contracts.[2] Under the Finance Agreement, Disney, the City, and the Authority agreed "to combine resources on

---

[2] The Authority is a "public agency" of the City, under the Joint Exercise of Powers Act. (See Govt. Code, § 6500 et seq.) The Authority's Board of Directors are the City's elected leaders. The entities share the same staff, facilities, etc.

the terms and conditions hereof to bring about a revitalization of the entire Anaheim Resort and to finance the public improvements needed for the Anaheim Resort, the expansion of the Convention Center, and the Disneyland Resort Project."

The Anaheim Resort spans about 1046 acres. The Disneyland Resort is located within the Anaheim Resort and includes all the theme parks, hotel rooms, retail establishments, and other facilities located on Disney property. In the Finance Agreement, Disney agreed to build a new theme park (California Adventure), a pedestrian bridge, additional hotel rooms, as well as new retail, dining, and entertainment facilities (Downtown Disney). The Authority agreed to issue municipal bonds to raise money to help pay for the project.

The Finance Agreement requires the bondholders to be repaid based on a complex arrangement. In brief, the Authority nominally "leases" the Convention Center to the City. The City makes "lease payments" to the Authority, which then uses those revenues to meet its bond obligations. The City's "lease payments" are calculated based on a formula: the Lease Payment Measurement Revenues (LPMR). After deducting a baseline figure (1996 local tax revenues), the LPMR is the sum of the incremental increases in the local taxes generated on Disney property (transient occupancy taxes, sales taxes, and property taxes), plus a percentage of the transient occupancy taxes paid by guests staying at other hotels (not located on Disney property).

The Finance Agreement also provides if the City imposes an entertainment tax within 15 years of June 2001, then every quarter "the City shall pay to Disney . . . a sum equal to the total amount paid to the City by Disney . . . during the preceding three (3) month period as the result of such Entertainment Tax."[3]

The Finance Agreement also includes the Enhancement Agreement. Under the Enhancement Agreement, Disney is obligated to make up any shortfall if the City's

---

[3] The Employees do not argue this provision gives Disney a right to a City Subsidy.

tax revenues dedicated to the payment of the bonds in a given year (the LPMR) are less than the bond payments that are due. Signed concurrently was the Reimbursement Agreement, signed by the City, the Authority, Disney, and the bond trustee. Under the Reimbursement Agreement, the parties agreed if Disney makes any shortfall payments (payable to the bond insurer), when the City's tax revenues rebound in subsequent years, then the bond trustee is to use those funds (received from the City) to reimburse Disney.

In November 2018, Anaheim's voters adopted Measure L. Starting in 2019, affected employers were required to pay their employees a minimum of $15 per hour under the LWO, with annual increases of $1 an hour. In 2023, the wage would then be tied to the consumer price index. The ballot materials stated: "The measure would apply to any for-profit business that is a hotel, motel, amusement or theme park, or any retail store, restaurant, or other venue offering food or beverages . . . that: (1) is located in whole or in part within the Disneyland or Anaheim Resort Specific Plan Zones, (2) has an agreement to receive a tax rebate from the City, or is a hospitality industry contractor or tenant of an entity that has such an agreement, and (3) has 25 or more employees."[4] (Anaheim Official Voter Information Guide, Gen. Elec. (Nov. 6, 2018) impartial analysis of Measure L by the City of Anaheim.)

*Procedural History*

In December 2019, the Employees filed a class action complaint. The Employees alleged they were employed by either Disney or Sodexo, and they were not paid a living wage, beginning on January 1, 2019. The Employees pleaded a violation of the LWO, and four derivative causes of action: a violation of state waiting time penalties, a violation of state overtime wage laws; unfair business practices, and civil

---

[4] On our own motion, we take judicial notice of the 2018 Anaheim Measure L ballot materials after having provided the parties notice and an opportunity to be heard. (See Evid. Code, § 459, subd. (d).)

5

penalties under the Private Attorneys General Act.

The Employees argued the City issued municipal bonds in 1997, which gave "Disney over $200 million dollars to help finance the construction of California Adventure and a parking garage to serve the new park." The Employees claimed: "The bonds are repaid with and secured by Disney taxes. Instead of going to the City for general purposes, almost all of Disney's transient occupancy, sales and real property taxes go to payments on the bonds, which will not be paid off until 2036. Disney got a rebate of the best kind: it got its taxes back before it paid them."

The Employees also argued: "In order to further secure the bonds to make them attractive to buyers, the bonds are supported by a Disney Credit Enhancement. Under this provision, Disney is obligated to make up any shortfall between bond payments that are due and Disney's taxes that are dedicated to the bonds. If this happens, the City is obligated to pay Disney back by rebating Disney's taxes . . . ."

In February 2020, Disney filed a demurrer claiming they are not covered under the LWO. Disney claimed the word "rebate" is narrowly defined as return of taxes paid by a taxpayer to that taxpayer. Disney further claimed any shortfall payments under the Enhancement Agreement are contractual in nature and not the payment of taxes; therefore, any reimbursements under the Reimbursement Agreement are not a return of Disney's taxes, or a "rebate."

In August 2020, the trial court overruled Disney's demurrer. The trial court found, "even under the Disney Defendants' definition [of a 'rebate'], the Credit Enhancement Agreement could be construed as creating a City Subsidy."

In April 2021, Disney filed a motion for summary judgment. The following facts were undisputed: all of the City's tax revenue goes into its general fund; on a daily basis, the City calculates the LPMR and transfers that amount from the general fund to a debt service fund; and on a monthly basis, the City wires the debt service fund to the bond trustee. It was also undisputed Disney has never had to make a shortfall

6

payment under the Enhancement Agreement, and therefore has never received a reimbursement under the Reimbursement Agreement.

In October 2021, the trial court granted Disney's motion for summary judgment. The court held: "A 'rebate . . . of taxes,' as that phrase is used in the [LWO], refers not only to a refund of taxes already paid, but also to an abatement of taxes yet to be paid, an exemption from taxes, etc." Nonetheless, the court concluded "there is no evidence that the Finance Agreement somehow lessens [Disney's] tax obligation. Therefore, the public benefit conferred . . . by the Finance Agreement does not create a City Subsidy."

As to the Credit Enhancement and Reimbursement Agreements, the trial court ruled, "all tax revenue, including Disney-related tax revenue, goes into the City's general fund. [Citation.] At that point, it is commingled with other revenue and ceases to be identifiable as 'Disney taxes.' Not surprisingly, [the employees] are unable to demonstrate how they would be able to trace/connect a particular Disney tax payment to a future shortfall repayment."

II

DISCUSSION

In a motion for summary judgment, the "defendant meets its burden . . . by negating an essential element of the plaintiff's case, or by establishing a complete defense, or by demonstrating the absence of evidence to support the plaintiff's case." (*First Commercial Mortgage Co. v. Reece* (2001) 89 Cal.App.4th 731, 736-737.)

The sole issue in this appeal is whether Disney benefits from a "City Subsidy" under the LWO. (§ 6.99.060.) This is a matter of statutory interpretation, or a pure question of law; therefore, our review is de novo and pays no heed to the trial court's ruling. (*Lateef v. City of Madera* (2020) 45 Cal.App.5th 245, 252.)

In the remainder of this discussion, we will: A) review relevant legal

7

principles; B) summarize Measure L and the LWO; and C) analyze the relevant laws as applied to the facts in this case.

## A. Relevant Legal Principles

In construing statutes adopted by voters, we apply the same principles of interpretation we apply to statutes enacted by the Legislature. (*People v. Park* (2013) 56 Cal.4th 782, 796.) "'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law.'" (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276.) We begin with the language of the statute, to which we give its plain and ordinary meaning, and construe in the context of the statutory scheme. If the language is unclear, we can look to other indicia of voter intent, such as the ballot materials. (*People v. Briceno* (2004) 34 Cal.4th 451, 459.)

Courts may not insert words or delete words when interpreting a statute; the drafting of statutes is purely a legislative power. (*People v. Hunt* (1999) 74 Cal.App.4th 939, 945-946.) "In construing this, or any, statute, our office is simply to ascertain and declare what the statute contains, not to change its scope by reading into it language it does not contain or by reading out of it language it does. We may not rewrite the statute to conform to an assumed intention that does not appear in its language." (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 253.)

The Supreme Court has long "recognized that statutes governing conditions of employment are to be construed broadly in favor of protecting employees." (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103.) That is, when interpreting statutes approved by voters to protect employees, "we adopt the construction that best gives effect" to the purposes of the electorate. (See *Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 262 ["In furtherance of that purpose, we liberally construe the Labor Code and wage orders to favor the protection of employees"].)

In the context of the Fair Labor and Standards Act (FLSA) and employment

laws generally, courts look to the *economic realities* of the employment relationship, rather than the labels used by the parties.  (*Real v. Driscoll Strawberry Associates, Inc.* (9th Cir. 1979) 603 F.2d 748, 755 ["Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA"]; *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, 953-954 ["the federal courts have developed what is generally described as the 'economic reality' test for determining whether a worker should be considered an employee or independent contractor"].)

Indeed, the economic reality test is used by courts in a variety of contexts. (See, e.g., *General Motors Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 773, 785 ["for tax purposes the economic reality of a transaction, not the form the parties employ, is dispositive"]; *Buckeye Boiler Co. v. Superior Court* (1969) 71 Cal.2d 893, 903 [in jurisdiction matters, courts should "focus on economic reality rather than the outward form of business transactions" in order "to determine the existence or nonexistence of purposeful activity within the state"].)

## B.  Measure L and the LWO

In November 2018, a majority of Anaheim voters voted "yes" when asked: "Shall the initiative ordinance to increase the minimum wage payable by hospitality industry employers located in the Anaheim or Disneyland Resort Specific Plan Zones that have tax rebate agreements with the City, and to require that service charges imposed by such employers be paid entirely to employees, be adopted?"

In the ballot materials, there were arguments for and against Measure L.  In the arguments for Measure L, the proponents stated:  "WHO IS AGAINST THIS MEASURE?  [¶]  Large hospitality employers who are getting subsidies from the City of Anaheim worth $600 million over the next 20 years!"

The Measure L ballot materials also stated:  "FACT:  a February 2018 study conducted by Occidental College and the Economic Roundtable found that

**Disneyland Resort employees struggle to make ends meet**: [¶] – 73% do not earn enough money to pay for basic expenses [¶] – Two-thirds don't have enough food to eat three meals a day [¶] – One in 10, including 13% with young children, has recently been homeless-or did not have a place of their own to sleep."

The LWO itself provides: "An Employer shall pay an Employee a wage of no less than the hourly rates set under the authority of this article." (§ 6.99.010.) "'Employer' means any business in the hospitality industry which benefits from a City Subsidy and directly or indirectly . . . employs or exercises control over the wages, hours or working conditions of 25 or more employees." (§ 6.99.060.) "'Hospitality industry' means a hotel, motel, amusement or theme park, or a restaurant, snack bar, bar, tavern, lounge, club or other venue offering food or beverages which is within or adjacent to a hotel, motel or amusement or theme park, or a retail store which is within or adjacent to a hotel, motel or amusement or theme park, located in whole or in part within The Anaheim Resort . . . or the Disneyland Resort . . . ." (§ 6.99.100.)

"A 'City Subsidy' is any agreement with the city pursuant to which a person other than the city has a right to receive a rebate of transient occupancy tax, sales tax, entertainment tax, property tax or other taxes, presently or in the future, matured or unmatured." (§ 6.99.030.) "'Person' means an individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust, association, joint venture, agency, instrumentality, or any other legal or commercial entity, whether domestic or foreign." (§ 6.99.110.)

*C. Analysis and Application*

The word "rebate" is not defined within the LWO. Generally, a "rebate" means "a return of a part of a payment." (Webster's 11th New Collegiate Dict. (2003) p. 1037.) This definition is consistent with California statutes, in which a "rebate" ordinarily means any kind of "retroactive abatement, credit, discount, or refund." (See

10

*Gonzales & Co. v. Department of Alcoholic Bev. Control* (1984) 151 Cal.App.3d 172, 176; see also Bus. & Prof. Code, § 25600.3, subd. (a)(4)(B) ["A discount or rebate that is offered . . . or furnished by a distilled spirits manufacturer"]; Rev. & Tax. Code, § 17138.2, subd. (a) ["gross income does not include any amount received as a rebate, voucher, or other financial incentive issued by a public water system, local government, or state agency for participation in a turf replacement water conservation program"].)

Consistent with the employee protection purposes of Measure L, we hold an employer has a right to receive *a rebate of taxes* under the LWO when there is any agreement with the City giving an employer a right to receive *a return of taxes*. By the plain terms of the LWO, the agreement can give the employer a right to receive a return of transient occupancy tax (paid by hotel guests), or a right to receive a return of sales tax (paid by consumers), or a right to receive a return of property tax (paid by property owners). Consequently, the right to receive a rebate of local taxes does not necessarily mean a return of the employer's own taxes; therefore, the monies returned to the employer need not be traceable back to any taxes specifically paid by that employer.

Here, under the Finance Agreement, the City agreed to issue municipal bonds through the Authority. The bondholders were to be repaid based on the LPMR: the incremental increases in the City's transient occupancy tax (paid by hotel guests on Disney property and other properties in Anaheim), sales tax (paid by consumers in businesses located within Disney owned property), and property tax (paid directly by Disney). Under the Enhancement Agreement, Disney agreed if there was any year in which the City's LPMR tax revenues in the debt service fund failed to meet its bond obligations to the bond trustee, Disney would then make up the shortfall (by paying a bond insurer who then pay the bond trustee). And under the Reimbursement Agreement, the parties agreed Disney would then be reimbursed by the City (through the bond trustee) for any of its shortfall payments in those years when the City's incremental tax revenues rebounded and were sufficient to meet its bond obligations.

11

We find that under these three agreements, particularly the Reimbursement Agreement, Disney has the right to receive a rebate—a return—of a portion of the incremental transient occupancy tax (paid by hotel guests), the local sales tax (paid by consumers), and the local property tax (paid by Disney) in those "rebound" years when the City's incremental tax revenues exceed its bond obligations.

In short, we hold Disney receives a "City Subsidy" within the meaning of the LWO and is therefore required to pay its employees a living wage. Thus, we reverse the trial court's order granting the defendants' motion for summary judgment.

Disney argues this interpretation "lacks the one thing it needs to possibly succeed: a citation to a provision of these agreements granting [Disney] a right to receive a rebate of *its* taxes." (Italics added.) But Disney's argument is flawed because it mistakenly assumes the LWO requires an agreement with the City giving the employer a right to receive a rebate of *its* taxes. The LWO contains no such limitation.

Again, the LWO states: "A 'City Subsidy' is any agreement with the city pursuant to which a person other than the city [an employer] has *a right to receive a rebate* of transient occupancy tax, sales tax, entertainment tax, property tax or other taxes, presently or in the future, matured or unmatured." (§ 6.99.030, italics added.)

The LWO does <u>not</u> state: A "City Subsidy" is any agreement with the City pursuant to which an employer has a right to receive a rebate of *its* transient occupancy tax, *its* sales tax, *its* property tax, or *its* other taxes.

Indeed, Disney's interpretation makes little sense because employers ordinarily collect—but do not pay—transient occupancy and sales taxes. We cannot rewrite the LWO to conform to Disney's flawed interpretation. (See *Vasquez v. State of California*, *supra*, 45 Cal.4th at p. 253 ["We may not rewrite the statute to conform to an assumed intention that does not appear in its language"].)

Disney also claims any shortfall payments under the Enhancement Agreement would go to the bond trustee indirectly through the bond insurer, rather than

12

to the City. Disney further claims these shortfall payments are based on a contract, and do not constitute taxes. (See *Linnell v. State Department of Finance* (1962) 203 Cal.App.2d 465, 469 [a "'tax is . . . in no way dependent upon the will or contractual assent, express or implied, of the person taxed'"].) Thus, Disney claims any return of shortfall payments under the Reimbursement Agreement are not a rebate of *its own* taxes.

Again, the Employees were not required to show that the Reimbursement Agreement gives Disney the right to a rebate or a return of its own traceable tax payments in order to survive the motion for summary judgment. (See § 6.99.030.)

Moreover, our role in this appeal is not to engage in a parsing of the labels used by the parties in the three underlying contracts. (See *General Motors Corp. v. Franchise Tax Bd.*, *supra*, 39 Cal.4th at p. 785 [courts look to the economic realities rather than the labels employed by the parties].) Our role is to effectuate the intent of the Anaheim voters as expressed through Measure L and the LWO. And when we put aside Disney's obfuscating labels, and consider the economic realities, it is plainly obvious that in any "rebound" years under the Reimbursement Agreement, Disney "has a right to receive a rebate of transient occupancy tax, sales tax, entertainment tax, property tax or other taxes, presently or in the future, matured or unmatured." (See § 6.99.030.)

Finally, in support of its claims, Disney offers an analogy involving a hypothetical bank that pays property taxes. Disney argues if the bank were to lend the City money, and the City paid the bank back over time, some portion of the City's loan payments would be coming out of the bank's property taxes, but no one would credibly argue the bank was somehow receiving a rebate of *its own* property taxes.

But yet again, Disney's analogy misses the mark because the LWO does not require an employer to receive a rebate of *its own taxes*. The LWO simply requires there be an agreement with the City to receive a rebate (i.e., an abatement, a credit, a discount, a refund, a reimbursement, etc.) of *any local taxes* identified in the LWO and imposed by the City "presently or in the future, matured or unmatured." (See

13

§ 6.99.030.)  Here, there is such an underlying agreement (specifically, the Reimbursement Agreement).  Thus, Disney's flawed analogy is not persuasive.


### III
### DISPOSITION

The trial court's order granting the defendants' motion for summary judgment is reversed.  The defendants are ordered to pay the Employees' costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


DELANEY, J.